OPINION OF THE COURT
C. Beauchamp Ciparick, J.
This is an action challenging the constitutionality of the Prenatal Care Assistance Program (Public Health Law § 2520 et seq.) (PCAP), a medical assistance program for pregnant women with incomes at or below 100 and 185% of the Federal poverty line, offering services designed to promote a healthy pregnancy, delivery and recovery.
Plaintiffs, 2 women with incomes between 100% and 185% of the Federal poverty line; 4 physicians who practice as obstetricians and gynecologists; 1 nurse-midwife affiliated with a New York City hospital; 7 health care clinics that serve women in the PCAP income bracket; 4 advocacy organizations whose memberships include women in this income category; and 2 members of the clergy who offer women in the stated income category guidance, move for (1) an injunction enjoining enforcement of Laws of 1989 (ch 584), effective January 1, 1990 (amending Public Health Law §§ 2521, 2522, 2529), and the regulations promulgated thereunder, to the extent that such enactments fail to provide reimbursement to health care providers who perform medically necessary abortions on women otherwise eligible for medical care under PCAP estab *987 lished by chapter 584; and (2) a declaration that the plaintiff class of women are entitled to funding of medically necessary abortions.
Defendants Cesar Perales, Commissioner of the New York State Department of Social Services, and David Axelrod, M.D., Commissioner of the New York State Department of Health, both directors of the State agencies charged with administering PCAP, cross-move for summary judgment declaring that PCAP is constitutional.
At a hearing on September 24, 1990, plaintiffs’ motion for a temporary restraining order enjoining enforcement of chapter 584 was denied without prejudice to further proceedings. Plaintiff Jane Hope at that time was over 21 weeks pregnant. Under the relevant criteria, it is alleged that Hope would be eligible for prenatal medical care under PCAP. As a carrier of sickle cell anemia, Hope was advised to terminate her pregnancy by abortion, a procedure specifically excluded from funding under PCAP.[1]
Therefore, Hope and Jane Moe, on behalf of all pregnant women who might require a therapeutic abortion, joined by *988 physicians who provide obstetrical and gynecological care to women who would be eligible for PCAP, a certified nurse-midwife, family planning and medical clinics who service women eligible for PCAP and advocacy organizations who represent and include as members women eligible for PCAP, instituted the instant action challenging the constitutionality of PCAP.
Plaintiffs maintain that chapter 584 violates provisions of the New York State Constitution including the Free Exercise of Religion Clause (NY Const, art I, §3), the Due Process Clause (NY Const, art I, § 6), the Equal Protection Clause (NY Const, art I, § 11), the clause pledging aid, care and support of the needy (NY Const, art XVII, § 1), and the clause pledging protection and promotion of the health of the inhabitants of the State (NY Const, art XVII, § 3) by excluding funds for medically necessary abortions to the class of women with incomes between 100 and 185% of the Federal poverty line ("eligible women”) who would otherwise be eligible for medical assistance under PCAP. Plaintiffs label the funding scheme of PCAP discriminatory against this class of women on the ground that it "burdens the exercise of the right of reproductive choice” and improperly pressures these women toward childbirth.
By stipulation dated and so ordered December 14, 1990, the parties agreed that if an eligible woman elects to have an abortion, she cannot be denied coverage for all other services provided in Public Health Law § 2522 (1) including, inter alla, transportation to all covered services, in-patient care, specialty physician and clinic services necessary following pregnancy or abortion to ensure a healthy recovery and mental health and related social services. Defendant New York State Department of Social Services agreed to send notices clarifying this to all Medicaid providers. It was further stipulated that the second and fifth causes of action were withdrawn with the exception of those allegations relating to transportation to and from an abortion and without prejudice to separate lawsuits by eligible women denied coverage for the services enumerated in Public Health Law § 2522 (1).
[The court’s discussion of the plaintiffs’ standing has been omitted for purposes of publication.]
BACKGROUND
Plaintiffs do not seek to halt the prenatal and postpartum *989 services currently being provided under PCAP. Indeed, it is uncontroverted that PCAP serves a laudatory purpose and none of the parties or amici to this proceeding would have this court void chapter 584 on the grounds of unconstitutionality effectively terminating all prenatal and obstetric assistance now extended under PCAP. Rather the instant dispute involves the scope of services funded under PCAP.
It is plaintiffs’ position that PCAP is underinclusive in its blanket exclusion of funds for all abortions without exception, for example, to preserve the life of the mother. Plaintiffs’ objective in this proceeding is to expand the breadth of chapter 584 to include financing for abortions in the case of medical necessity by way of an injunction prohibiting denial of such funding.
Plaintiffs insist that in the wake of Webster v Reproductive Health Servs. (492 US 490), Hodgson v Minnesota (497 US —, 110 S Ct 2926), and Ohio v Akron Center for Reproductive Health (497 US —, 110 S Ct 2972), the Federal right to privacy is tenuous and in this case New York is given the opportunity to reaffirm the fundamental nature of the right to an abortion under the New York State Constitution where, as here, the State lacks the compelling interest needed to justify impairment of such right by legislative decree.
While plaintiffs acknowledge that the State is not required to finance the exercise of fundamental constitutional rights (Harris v McRae, 448 US 297), they nevertheless maintain that the State cannot wield its economic power to dictate the choice it prefers, in this instance, childbirth.
Defendants counter that New York has an important and substantial interest in providing access to prenatal and obstetric care to women with incomes between 100 and 185% of the Federal poverty line who otherwise might not have sought such care or postponed it until the late stages of pregnancy. To address this interest the Legislature enacted chapter 584 as "one step” toward ameliorating this serious problem. PCAP is intended to expand an existing medical assistance program; there is no constitutional requirement that it be all encompassing. Defendants contend that the legislative decision to promote the health of newborns through a specifically tailored medical assistance program does not deprive this group of women of their right to obtain an abortion simply because the State is not supplying the funds. Indeed, the State assumes these women can raise the funds necessary to obtain an *990 abortion as they are above the poverty line and presumably have resources to draw upon. Therefore, defendants declare that PCAP places no obstacles in an eligible woman’s path to obtain an abortion and does not impinge on the exercise of her right to choose an abortion.
PCAP
PCAP was first established on the Federal level to authorize reimbursement for medical services related to pregnancy provided to women with incomes up to 185% of the poverty level (42 USC § 1396a [a] [10] [A] [i] [III]). Reimbursement is given only for expenditures authorized by statute, unlike Medicaid which provides reimbursement for all medically necessary care rendered to qualified individuals.
To avail itself of these designated PCAP Federal funds, New York adopted chapter 584 establishing the State guidelines for PCAP, which act expressly provides that funding is only available to the extent of Federal reimbursement — which does not include funding for abortions. Under PCAP, any Medicaid provider is authorized to furnish the enumerated services and obtain reimbursement.
An eligible woman has no claim for State assistance under PCAP unless she is pregnant. At this time, she becomes presumptively eligible for the panoply of services offered under PCAP. Regardless of the circumstances, she is not entitled to funds for an abortion, even if her health and/or life is in grave danger because of the pregnancy.
Certainly, the dichotomy of care created by PCAP is not designed to ensure that an eligible woman receives the medical assistance best suited for her for it ignores the risks to her health and the likelihood of grave fetal defects if she is left with no alternative but to bear the child when medically unwarranted. Under the existing legislative scheme, a poor working woman in this predicament should be able to raise the funds necessary to obtain an abortion. The wisdom and motivation behind this presumption underlying this policy established by the Legislature not to include funds for abortion, however, are not justiciable issues (Planned Parenthood Fedn. v Agency for Intl. Dev., 915 F2d 59 [2d Cir 1990]; Klostermann v Cuomo, 61 NY2d 525). What is justiciable is whether the funding scheme of PCAP abridges an eligible woman’s constitutional right to obtain an abortion free from governmental intrusion.
*991 DUE PROCESS
A full three years before the United States Supreme Court decision in Roe v Wade (410 US 113 [1973]), New York amended its law to recognize that the State had no right to interfere in the most personal and important decision a woman can make regarding her body and her life. In 1970, New York State repealed the criminal sanctions against abortions performed during the first two trimesters of pregnancy (Penal Law § 125.05 [3]). This dramatic change in the law is the cornerstone principle of what has come to be recognized as a woman’s constitutional right to abortion.
Roe v Wade established that the United States Constitution protects a woman’s right to terminate her pregnancy (410 US 113, supra). Roe held that an individual’s fundamental liberty "to bear or beget a child” extended to a right to abortion, and identified the two governmental interests which, if compelling, might limit that right: "the protection of a woman’s own health and an interest in a developing fetus.” (Dellinger & Sperling, Abortion and the Supreme Court: The Retreat from Roe v. Wade, 138 U Pa L Rev 83, 86 [1989].)
Since Roe (supra), the Supreme Court has heard challenges to regulations concerning reimbursement programs that exclude funds for abortion as violative of the fundamental right to abortion (see, e.g., Poelker v Doe, 432 US 519 [1977]; Maher v Roe, 432 US 464 [1977]; Harris v McRae, 448 US 297 [1980], supra; Williams v Zbaraz, 448 US 358 [1980]). In response, the Supreme Court has held that the Constitution imposes no obligation on a State to pay the pregnancy-related medical expenses of indigent women (Maher v Roe, supra, at 469). "[A] woman’s freedom of choice [does not] carr[y] with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices” (Harris v McRae, supra, at 316). However, "when a State decides to alleviate some of the hardships of poverty by providing medical care, the manner in which it dispenses benefits is subject to constitutional limitations” (Maher v Roe, supra, at 469-470).
That PCAP provides funds for only one of the only two courses of treatment for pregnancy is not only inconsistent with New York’s long and liberal history of aiding residents it identifies as needy in some regard, it is contrary to the constitutional right to privacy guaranteed by the Due Process Clause of the New York State Constitution. This clause, enacted before its Federal counterpart in the Fourteenth
*992 Amendment, has been construed to bestow greater rights on those it is intended to protect (see, e.g., People v Hobson, 39 NY2d 479 [right to counsel]; People v Harris, 77 NY2d 434 [defendant’s station house confession suppressed under State constitutional prohibition of illegal searches and seizures]; Immuno AG. v Moor-Jankowski, 77 NY2d 235 [opinion protected under New York Constitution]; Titone, State Constitutional Interpretation: The Search for an Anchor in a Rough Sea, 61 St. John’s L Rev 431, 466 [1987]: ["(t)his history of solicitude for a particular right has been used by the New York courts as a foundation for fashioning a body of state constitutional law that is substantially more protective of that right than is the federal Constitution. Indeed, in New York, our traditions, which include judicial concern for the right of privacy and personal liberty, make up a vital part of our judges’ psyches”]).
Indeed, New York State continues to include funding for abortions in the basic Medicaid program available to women at or below 100% of the Federal poverty line in spite of the Supreme Court rulings that exclusion of such funding is not unconstitutional and the consequent of lack of Federal reimbursement for such service (Social Services Law § 365-a [5] [b]; cf., City of New York v Wyman, 66 Misc 2d 402 [Sup Ct, NY County 1971], revd 37 AD2d 700 [1st Dept 1971], revd 30 NY2d 537 [1972], where the Court of Appeals upheld a directive of the Commissioner of Social Services restricting Medicaid reimbursements for abortions that were " 'medically indicated’ ”; since the Wyman cases and prior to the enactment of Laws of 1989 [ch 584] on July 19, 1989, New York State always included abortion in the range of medically necessary services funded entirely by the State Medicaid program, except for those abortions necessary to preserve the life of the woman for which partial reimbursement is available from the Federal Government).
New York City has gone even one step further. Since PCAP became effective, the city has authorized the New York City Health and Hospitals Corporation to provide medically necessary abortions to women otherwise eligible for PCAP at no cost and at a loss to the city. The city believes this policy is realistic given the stark reality of the financial condition of the eligible women. According to the city, pregnant women at the income level necessary to qualify for assistance under PCAP earn between $99 and $921 per month. The expenses associated with an abortion average between $235 and $1,000, *993 a substantial portion of an eligible woman’s monthly income, which, for all intents and purposes, the woman is not free to save, when her fixed expenses such as rent, food and transportation are calculated into the equation.
In constitutional terms, the right to privacy involves freedom of choice, the broad general right to make decisions concerning oneself and to conduct oneself in accordance with those decisions free of governmental restraint or interference (Matter of Doe v Coughlin, 71 NY2d 48, 52, cert denied 488 US 879). The essence of this freedom is the absence of governmental restraint or interference in the personal decisions concerning contraception (Eisenstadt v Baird, 405 US 438 [1972]), procreation (Skinner v Oklahoma, 316 US 535 [1942]), and abortion (Roe v Wade, 410 US 113 [1973], supra), to name just a few that fall within the ambit of this concept of privacy (see, Doe v Coughlin, supra, at 52; Cooper v Morin, 49 NY2d 69, cert denied sub nom. Lombard v Cooper, 446 US 984; Rivers v Katz, 67 NY2d 485).
Historically, the New York Court of Appeals has read our State Constitution expansively, broadening the scope of individual rights and liberties accorded by the Federal Constitution, finding the basis for such rights in our State Constitution (see, People v P. J. Video, 68 NY2d 296, 303, cert denied 479 US 1091, referring to Rivers v Katz, 67 NY2d 485, supra [right of involuntarily committed mental patients to refuse antipsychotic medication]; People v Hobson, 39 NY2d 479, supra [right to counsel]; People v Isaacson, 44 NY2d 511 [due process limits on police conduct]; Immuno AG. v Moor-Jankowski, 77 NY2d 235, supra [opinion privilege recognized under New York Constitution]; People v Harris, 77 NY2d 434, supra [suppressed defendant’s station house confession under State constitutional provisions prohibiting unlawful searches and seizures]). Indeed, the New York State Constitution is the primary source of the civil liberties of New York State residents.
The Due Process Clause of the NY Constitution found in section 6 of article I mandates that "[n]o person shall be deprived of life, liberty or property without due process of law.” The independent construction accorded to our State Constitution to grant broader rights and liberties to New York citizens than rights secured under the Federal Constitution "finds its genesis in the unique language of the due process clause of the New York Constitution” (Sharrock v Dell-Buick Cadillac, 45 NY2d 152, 159). The Due Process Clause of the New York State Constitution has "long safeguarded any *994 threat to individual liberties, irrespective of from what quarter that peril arose” (supra, at 160).
Where, as here, a statute is challenged on nonprocedural grounds as violative of due process, the appropriate question is "whether there is some ' " 'fair, just and reasonable connection’ between it and the promotion of the health, comfort, safety and welfare of society” ’ ” (Montgomery v Daniels, 38 NY2d 41, 54). A "regulation which is reasonable in relation to its subject and is adopted in the interest of the community is due process” (West Coast Hotel Co. v Parrish, 300 US 379, 391).
PCAP provides medical assistance for all services related to pregnancy and childbirth, including prenatal risk assessment and laboratory services to detect fetal abnormalities. Laws of 1989 (ch 584) also provides medical care for 60 days following termination of the pregnancy, resulting from either childbirth or abortion. However, funds are unavailable for abortion even if such procedure is medically indicated. The right of a pregnant woman to choose an abortion in circumstances where it is medically indicated is one component of the right of privacy rooted in the Due Process Clause of the New York State Constitution (see, e.g., Matter of Klein, 145 AD2d 145, lv denied 73 NY2d 705).
In excluding funds for all abortions, PCAP is facially deficient as it cannot fulfill its stated objective to combat infant mortality and promote healthier babies. Take, for example, the case of plaintiff Jane Hope.
Hope, a carrier of sickle cell anemia, is 19 years old, works 44 hours per week and attends college at night. After noticing a marked weight loss and feelings of nausea and dizziness in the mornings, Hope visited a clinic for a pregnancy test. The test came back positive. At this point, Hope was advised that an abortion would cost $900. Hope left school to save money for the abortion. Four weeks later, Hope again visited the clinic. At this point she was 21 weeks pregnant and she was advised that the abortion would now cost between $1,000 and $1,500. Further, the attending physician informed her that under the Medicaid standard, an abortion was medically necessary in her circumstance.
Hope, however, is ineligible for all Medicaid because her income falls between 100 and 185% of the Federal poverty line, despite the fact that after her rent and daily living expenses are satisfied, she lacks the resources to maintain *995 medical insurance. After saving for four weeks and borrowing money from friends, Hope still lacked the money for an abortion.
Plaintiffs have proffered several affidavits documenting the hardships women in the affected income category like Hope and others similarly situated encounter in attempting to save for an abortion. Often such women are either forced to postpone the procedure increasing not only the medical risk to themselves but also the cost of the abortion, or to forego the procedure altogether, jeopardizing their own health. Defendants do not dispute these facts; indeed they acknowledge that women in the plaintiff class "may face difficulty paying for an abortion.” Now that the Legislature has singled these women out, their desperation should not be ignored.
PCAP works a constitutionally impermissible result in this regard as it bases assistance on conduct, not need. Plainly, if Hope carried to term and gave birth all services available under PCAP would be available notwithstanding the danger to her health and the baby’s probable affliction with sickle cell anemia. Such a result is not "fairly”, "justly”, "rationally” or "reasonably” related to combating infant mortality or low birth weight. While the Legislature can express a preference for childbirth over abortion and allocate resources accordingly, it cannot transgress constitutional principles to achieve this result. It is an eligible woman’s exercise of the fundamental right to abortion which triggers PCAP’s unconstitutional restriction. This court cannot disregard the practical realities; "[freedoms such as [the right to choose an abortion] are protected not only against heavy-handed frontal attack, but from being stifled by more subtle governmental interference” (Bates v Little Rock, 361 US 516, 523).
This court agrees with plaintiffs’ contention that PCAP impermissibly pressures an eligible indigent woman toward childbirth, abridging a constitutionally protected right. "By funding all of the expenses associated with childbirth and none of the expenses incurred in terminating pregnancy, the Government literally makes an offer that the indigent woman cannot afford to refuse” (Harris v McRae, 448 US 297, 333-334, supra [Brennan, J., dissenting]). The enactment of PCAP highlights the dire need of the "working” poor woman for medical assistance related to pregnancy. A medical assistance program that conditions the availability of medical assistance on the State-preferred choice of childbirth effectively precludes an eligible woman from any real choice in the funda *996 mental decision of whether " 'to bear or beget a child’ ” (see, Carey v Population Servs. Intl., 431 US 678, 687; Planned Parenthood v Danforth, 428 US 52, 70, n 11; Harris v McRae, supra, at 336 [Brennan, J., dissenting] ["the government withholds financial benefits in a manner that discourages the exercise of a due process liberty: the indigent woman who chooses to assert her constitutional right to have an abortion can do so only on pain of sacrificing health-care benefits to which she would otherwise be entitled”]).
The fact that her poverty is the proximate cause of an eligible woman’s inability to terminate her pregnancy demonstrates the coercive impact of PCAP. In this light, PCAP becomes an affirmative act by the State blocking a woman without means from obtaining an abortion, possibly creating a serious risk to that woman’s life and/or health. The "discriminatory distribution of the benefits of government largesse can discourage the exercise of fundamental liberties just as effectively as can an outright denial of those rights through criminal and regulatory sanctions” (Harris v McRae, supra, at 334 [Brennan, J., dissenting]; accord, Committee to Defend Reproductive Rights v Myers, 29 Cal 3d 252, 172 Cal Rptr 866, 625 P2d 779; Right to Choose v Byrne, 91 NJ 287, 450 A2d 925; Doe v Maher, 40 Conn Sup 394, 515 A2d 134; Planned Parenthood Assn. v Department of Human Resources, 63 Ore App 41, 663 P2d 1247; Moe v Secretary of Admin. & Fin., 382 Mass 629, 417 NE2d 387; Doe v Director of Mich. Dept. of Social Servs., 187 Mich App 493, 468 NW2d 862). The State cannot wield its economic power to influence a woman to choose childbirth, especially in a case where that decision can prove fatal to her.
The selective, conduct-oriented financing scheme of PCAP of providing funds for childbirth regardless of the expense to maternal and fetal health, directly impacts on the exercise of the pregnant, eligible woman’s fundamental right to choose abortion. The court is mindful of the weighty precept that there is no constitutional requirement for a State to accord equal treatment to both abortion and childbirth (Maher v Roe, 432 US 464, 470, supra). However, it is inconsistent and even irreconcilable to find that a State-sponsored aid program providing prenatal services furthers, at best, a "compelling” or, at least, an important, State interest when certain eligible recipients are denied assistance in spite of their medical condition. Chapter 584 discriminates against women for whom an abortion is medically necessary but cannot afford to pay for *997 such procedure in favor of women who seek medical care for childbirth (see, Right to Choose v Byrne, 91 NJ 287, 450 A2d 925, supra). After all, medical care is required by virtue of the pregnancy; to condition such medical assistance on the result desired by the State and not on the medical condition of the pregnant woman effectively wrests control from the pregnant woman over her body and health. To find otherwise not only ignores reality it effectively erects an economic obstacle in the path of the poor working woman’s journey to obtain a medically necessary abortion. That the Legislature may articulate a preference for " 'normal childbirth’ ” cannot "camouflage the simple fact that the purpose, more starkly expressed, is discouraging abortion” (Perry, The Abortion Funding Cases: A Comment on the Supreme Court’s Role in American Government, 66 Geo LJ 1191, 1196 [1978]). As PCAP presently stands it violates the due process rights of a pregnant eligible woman for whom an abortion is medically necessary by leaving her with no real choice in the decision of whether to "bear or beget a child.”
AID TO NEEDY
Plaintiffs submit that women with incomes at or below 185% of the Federal poverty line are income eligible for PCAP and in this regard such women are classified as needy. According to plaintiffs, chapter 584 violates NY Constitution, article XVII, § l[2] by denying aid to a group of women the Legislature has categorized as needy by virtue of their medical need to terminate their pregnancies.
Public assistance to the needy is a matter of significant interest in this State, provision for which is expressly included in our State Constitution (Tucker v Toia, 43 NY2d 1, 8). It has been established that section 1 of article XVII imposes an affirmative duty on the State to aid the needy (supra). The Legislature is vested with the discretion to determine the amount of aid, to classify recipients and to define the term "needy” (Matter of Bernstein v Toia, 43 NY2d 437, 449). However, the Legislature is precluded from "simply refusing to aid those whom it has classified as 'needy’ ” (Tucker v Toia, supra, at 8).
*998 The effect of chapter 584 is to deny medical assistance to needy women if the required medical procedure is abortion. Not only does this result ignore the reality of a needy, pregnant woman’s situation where an abortion is medically necessary, it contravenes the affirmative obligation placed upon the State by article XVII, § 1 to aid its needy residents. The Legislature may not deny aid to eligible women it categorized as needy on the basis of criteria not at all related to need (Tucker v Toia, supra; cf., Matter of Barie v Lavine, 40 NY2d 565, 570).
Similarly, plaintiffs allege that PCAP violates the constitutional mandate found in article XVII, § 3. This provision states: "The protection and promotion of the health of the inhabitants of the state are matters of public concern and provision therefor shall be made by the state and by such of its subdivisions and in such manner, and by such means as the legislature shall from time to time determine.” Plaintiffs assert that the fact that plaintiffs will seek medically necessary abortions raises health issues of public concern for which the Legislature is required to provide assistance.
The stated purpose of PCAP to promote infant health is an important matter of public concern. However, the impact of the unequal financing scheme of PCAP undermines the substantial interest of the State in the life, health and welfare of the eligible pregnant women for whom an abortion is medically required. This result is contrary to the dictates of both sections 1 and 3 of article XVII of the NY Constitution.
[The court then concluded that PCAP is not violative of the Free Exercise Clause. This discussion has been omitted for purposes of publication.]
EQUAL PROTECTION
Plaintiffs contend that chapter 584 violates the State Equal Protection Clause. Plaintiffs argue that the right to choose to obtain an abortion is a fundamental precondition of a woman’s exercise of equality under the law and in denying funds for abortions under PCAP to eligible women for whom such procedure is medically mandated, the State controls and alters the lives of women in a way it does not control and alter the lives of men.
In addressing an equal protection claim, the threshold decision involves determination of the standard of review (Montgomery v Daniels, 38 NY2d 41, 59, supra). If a statute burdens *999 a " 'fundamental interest’ ” or employs a " 'suspect’ ” classification, it must withstand strict scrutiny (Alevy v Downstate Med. Center, 39 NY2d 326, 332). Where strict scrutiny is required, a painstaking inquiry is made to ensure the existence of a proper governmental objective (supra, at 335). The statute is void unless necessary to promote a compelling State interest and is narrowly tailored to achieve that purpose (Matter of Rosenstock v Scaringe, 40 NY2d 563). If neither a fundamental right is abridged nor a suspect classification is created, the statute will be sustained if it bears a reasonable relationship to a legitimate legislative objective (Alevy v Downstate Med. Center, supra, at 332; Maresca v Cuomo, 64 NY2d 242, 250, appeal dismissed 474 US 802).
By funding only the expenses of childbirth for a class of working poor women, PCAP intrudes on the fundamental right of an eligible woman for whom an abortion is medically prescribed to obtain such procedure. "The fact that * * * [PCAP] may not operate as an absolute bar preventing all indigent women from having abortions is not critical. What is critical is that the State has inhibited their fundamental right to make that choice free from state interference” (Maher v Roe, 432 US, supra, at 488 [Brennan, J., dissenting]).
The fact that indigency or pregnancy does not confer "suspect” status on this class of women (Maher v Roe, supra, at 470-471) cannot change the fact that under PCAP it is their indigency and pregnancy which jeopardizes their constitutional right to choose an abortion.
Although the poverty of eligible women is not of the State’s creation (Maher v Roe, supra, at 474) and there is no constitutional obligation to pay for the medical care of the poor (supra), the New York State Equal Protection Clause guarantees equal participation in State benefits once such benefits are extended (see, East Meadow Community Concerts Assn. v Board of Educ., 18 NY2d 129, 133; Matter of Madole v Barnes, 20 NY2d 169, 173; accord, Moe v Secretary of Admin. & Fin., 382 Mass 629, 417 NE2d 387, supra; Doe v Maher, 40 Conn Sup 394, 515 A2d 134, supra; Roe v Wade, 410 US 113, supra).
In this regard PCAP is underinclusive. PCAP exempts eligible women for whom an abortion is medically prescribed from receiving State assistance on the ground that PCAP is intended to promote healthier babies and reduce the incidence of infant mortality. However, there can be no compelling justification for that medical assistance program which in *1000 practice endangers the health and lives of eligible women for whom an abortion is medically necessary, women whom the Legislature has expressly identified as needy in regard to medical care. While reducing the incidence of low birth weight and infant mortality are legitimate State interests they can never outweigh the superior State interest in preserving the life and health of the mother (Roe v Wade, 410 US 113, supra). Indeed, balanced against the interest of the pregnant woman in choosing a medically necessary abortion, the State’s interest is insufficient and, as effectuated through PCAP, far too burdensome on the eligible woman’s right, to sustain. The blanket exclusion of all funds for abortion regardless of the circumstances undermines the State’s interest in protecting the health and welfare of the pregnant eligible woman.
To the extent that PCAP restricts funding for medically necessary abortions to pregnant women who require such treatment to preserve their lives and/or health and who are otherwise eligible for assistance under PCAP, it is constitutionally deficient.
When a statute is constitutionally defective because of underinclusion, a court may either strike the statute rendering it inapplicable to everyone or extend coverage to individuals formerly excluded (People v Liberta, 64 NY2d 152, 170, cert denied 471 US 1020; Matter of Jessie C., 164 AD2d 731; Califano v Westcott, 443 US 76, 89). "[Wjhile courts traditionally refrain from construing a challenged statute in such a way so as to 'expand’ or add to the language * * * under appropriate circumstances, a court may read a statute expansively, or in tandem with other statutes, so as to prevent serious damage to overriding public policy” (Childs v Childs, 69 AD2d 406, 418, cert denied 446 US 901).
To remedy the constitutional defect inherent in chapter 584, PCAP must be expanded to include funds for medically necessary abortions. However, this court is mindful not only of the sanctity of the separation of judicial and legislative functions but of the perception that any policy and/or rule making is a function reserved to the exclusive domain of the Court of Appeals (see, People v Keta, 165 AD2d 172). While it is within the power of this court to declare PCAP underinclusive, to properly fashion the remedy the combined efforts of the judiciary and Legislature are required. As the Legislature created PCAP in the first instance, it may ultimately be their decision that determines whether it will be funded in accordance with this decision.
*1001 The parties are advised that as this is a case involving the constitutionality of a State statute, appeal may be taken directly to the Court of Appeals (CPLR 5601 [b] [2]; 7 Weinstein-Korn-Miller, NY Civ Prac [j 5601.02).
Accordingly, this court stays enforcement of the order declaring that the plaintiff class of eligible women is entitled to nondiscriminatory funding of medically necessary abortion procedures and attendant services and enjoining the denial of such funding under chapter 584 pending appeal.
[Portions of opinion omitted for purposes of publication.]

. Funding is provided only for specifically enumerated services. Chapter 584, codified in section 2522 of the Public Health Law, states:
"1. Comprehensive prenatal care services available under the prenatal care assistance program include:
"(a) prenatal risk assessment;
"(b) prenatal care visits;
"(c) laboratory services;
"(d) health education for both parents regarding prenatal nutrition and other aspects of prenatal care, alcohol and tobacco use, substance abuse, use of medication, labor and delivery, family planning to prevent future unintended pregnancies, breast feeding, infant care and parenting;
"(e) referral of pediatric care;
"(f) referral for nutrition services including screening, education, counseling, follow-up and provision of services under the women, infants and children’s program and the supplemental nutrition assistance program;
"(g) mental health and related social services including screening and counseling;
"(h) transportation services for prenatal care services;
"(i) labor and delivery services;
"(j) post-partum services including family planning services;
"(k) inpatient care, specialty physician and clinic services which are necessary to assure a healthy delivery and recovery;
"(1) dental services;
"(m) emergency room services;
"(n) home care; and
"(o) pharmaceuticals.”

. NY Constitution, article XVII, § 1 provides: "The aid, care and support of the needy are public concerns and shall be provided by the State and by such subdivisions and in such manner and by such means as the Legislature may from time to time determine.”