**In re INITIATIVE PETITION NO. 349,
STATE QUESTION NO. 642.**

**No. 76437.**

Supreme Court of Oklahoma.

Aug. 4, 1992.

As Corrected Aug. 5 and 18, 1992.

Kevin M. Abel, William A. Caldwell, Michael W. Pierce, Tulsa, for proponents, Okl. Coalition to Restrict Abortion, Inc. and Fred W. Sellers, Jr.

Robert H. Henry, Atty. Gen., Susan Loving,[1] Atty. Gen., Neal Leader, Rachel Lawrence–Mor, Asst. Attys. Gen., Oklahoma City, for State.

Thomas Dee Frasier, Laura Emily Frossard, Gary Dean Allison, Tulsa, for protestants, Nancy Feldman & Kim Little.

Richard A. Mildren, Gary L. Watts, Oklahoma City, Rebecca J. Patten, Norman, Kathryn Kolbert, Simon Heller, Andrew Dwyer, New York City, for protestants, Janet Taliaferro, Andrew Tevington, & Pam Fleischaker.

Roger K. Evans, Carole Chervin, New York City, for amici curiae, U.S. Senator David Boren, U.S. Representatives Dave McCurdy and Mike Synar, The Former Speaker of the U.S. House of Representatives Carl Albert, Bruce Ackerman, Paul Brest, Guido Calabresi, Walter Dellinger, Geoffrey Stone, & Lawrence Tribe.

KAUGER, Justice.

Although this proceeding, filed in reference to Initiative Petition No. 349 (petition/abortion petition), initially presented multiple issues, the United States Supreme Court's decision in *Planned Parenthood v. Casey*, —— U.S. ——, ——, 112 S.Ct. 2791, 2815, 120 L.Ed.2d 674 (1992) has rendered a single issue dispositive—whether Initiative Petition No. 349 is constitutional. We find: 1) that the issue of the constitutionality of the initiative petition is governed by the United States Supreme Court's pronouncement in *Casey;* and that we are bound to follow the mandate of the United States Supreme Court on matters of federal constitutional law; and 2) that when the unconstitutionality of the initiative petition is manifest, a pre-election judicial determina-

1. Successor Attorney General during the pendency of the appeal.

tion of the issue is both appropriate and necessary to avoid a costly and useless election.

The *Casey* court held that: 1) a woman's right to obtain an abortion is a liberty interest protected by the Due Process Clause of the Fourteenth Amendment;[2] 2) viability marks the earliest point at which the State's interest is constitutionally adequate to justify a legislative ban on non-therapeutic abortions; and 3) before viability, a woman may choose to have an abortion without undue interference by the State. Because Oklahoma women who do not fall within four narrowly defined categories would be absolutely prohibited from exercising the pre-viability liberty interest expressly recognized by *Casey*, we are required to find the initiative petition unconstitutional. We also find that an examination of the constitutionality of the initiative petition is necessary, both to avoid misleading citizens about the legal effect of the proposition upon which they may vote, and to avoid a costly election which would ultimately be an exercise in futility. [Nevertheless, this ruling does not prohibit the circulation of a proper initiative petition or of legislation which passes constitutional muster.]

## RELEVANT PROCEDURAL HISTORY

The proponents, Oklahoma Coalition to Restrict Abortion, Inc., and Fred W. Sell-

ers, Jr. (collectively, proponents/Sellers) filed petition pamphlets with the Secretary of State on June 29, 1990. On December 31, 1990, the protestants, Nancy Feldman and Kim Little (collectively, Feldman) filed a protest to the legal sufficiency of the petition. On January 8, 1991, the Secretary of State filed the proposed ballot title prepared by the Attorney General. The proponents filed a timely appeal to the ballot title on January 17, 1991. Although Feldman also appealed the ballot title, the challenge was dismissed by order of this Court on April 13, 1992, as being untimely. However, a valid ballot title challenge is before us—the one filed by the proponents. The initial briefing period concerning the legal sufficiency of Initiative Petition No. 349 was commenced when this Court ordered a briefing schedule on March 3, 1992. The final filings of the parties were submitted to the Court on June 4, 1992.

The issue of the constitutionality of the initiative petition was fairly raised within certain of the other issues raised by Feldman in the challenge to the legal sufficiency of the petition.[3] On July 14, 1992, in the interest of fairness, we ordered the parties and the Attorney General to submit simultaneous briefs addressing *Casey* and its impact on the constitutionality of the proposed ballot title and the substance of Initiative Petition No. 349.[4] Those briefs were filed on July 24, 1992.

**2.** The United States Const. amend. XIV, § 1 provides:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Fourteenth Amendment is enforceable against the states. When the United States Supreme Court speaks on matters of federal constitutional law, state courts are bound under the Fourteenth Amendment to follow its mandate. *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961).

**3.** Initially, Feldman raised a myriad of constitutional challenges. However, when Feldman

filed the brief in support of the protest to the petition, all constitutional challenges *except those relating to federal constitutional law* were waived. The federal constitutional issues were raised to demonstrate that even if the Initiative Petition were approved by the people, it could not survive a constitutional challenge and would be ineffective to regulate first and second trimester abortions. Sellers responded to the constitutional challenges.

**4.** We are bound under the United States Const. art. VI, cl. 2 and the Okla. Const. art. 1, § 1 to follow the United States Constitution as the supreme law of the land. We are required under 12 O.S.1991 § 2201(A) to take judicial notice of the United States Constitution and the Constitution of the State of Oklahoma. Even if this were not so, in matters of *publici juris,* the Court may on its own raise and determine the issue. As Chief Justice Opala wrote for the majority of the Court in *Matter of McNeely,* 734 P.2d 1294, 1296 (Okla.1987):

In response to this Court's order of July 14, 1992, the proponents, Sellers, and the protestants, Nancy Feldman, Kim Little, Janet M. Taliaferro, Andrew Tevington, and Pam Fleischaker (collectively, protestants) and the Attorney General filed briefs specifically addressing the constitutionality of the initiative petition in relation to the United States Supreme Court's decision in *Planned Parenthood v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2815, 120 L.Ed.2d 674 (1992). We also granted the amici's motion to brief the issue. The protestants, the amici curiae, and the Attorney General assert that Initiative Petition No. 349 is unconstitutional under the United States Supreme Court's ruling in *Casey.* As we read the proponents submission, they concede that the initiative petition was unconstitutional when it was drafted, that it was unconstitutional when it was circulated, and that it is unconstitutional now. However, the proponents insist that we should allow the petition to go forward as an exercise in political advocacy. We find that the initiative petition is unconstitutional based on controlling federal precedent enunciated by the United States Supreme Court as recently as June 29, 1992.

## I.

### THE CONSTITUTIONALITY OF THE INITIATIVE PETITION IS GOVERNED BY THE UNITED STATES SUPREME COURT'S PRONOUNCEMENT IN *PLANNED PARENTHOOD v. CASEY.* BECAUSE WOMEN WHO DO NOT FALL WITHIN FOUR NARROWLY DEFINED CATEGORIES MAY NOT EXERCISE THE PRE–VIABILITY LIBERTY INTEREST RECOGNIZED BY *CASEY,* WE ARE REQUIRED TO FIND THE INITIATIVE PETITION UNCONSTITUTIONAL.

When the initiative petition was filed, it appeared that a major re-examination of the law in relation to a woman's right to obtain a nontherapeutic abortion was in progress. Legal commentators anticipated either the overruling or the substantial undercutting of the principles of *Roe v. Wade,* 410 U.S. 113, 163–64, 93 S.Ct. 705, 731–32, 35 L.Ed.2d 147, 182–83 (1973).[5] In *Webster v. Reproductive Health Serv.,* 492 U.S. 490, 518, 109 S.Ct. 3040, 3052, 106 L.Ed.2d 410, 435–36 (1989), the United States Supreme Court rejected the strict trimester approach of *Roe v. Wade.* The *Webster* Court also found that a State's interest in protecting human life did not come into play only at viability as previously expressed in *Roe.*[6] Additional evidence of the

---

"... The dispositive issue here—one of public law—was neither raised nor briefed by the parties. When public-law issues are present this court may, on review, resolve them by application of legal theories that were not tendered below...."
See also, *Davis v. Davis,* 708 P.2d 1102, 1104 (Okla.1985) (Overruled on other grounds.), also authored by Chief Justice Opala for the majority of the Court.
Title 12 O.S.1991 § 2201 provides in pertinent part:
"A. Judicial notice shall be taken by the court of the common law, constitutions and public statutes in force in every state, territory and jurisdiction of the United States...."

**5.** See, S. Hewett, "*Hodgson v. Minnesota:* Chipping Away at *Roe v. Wade* in the Aftermath of *Webster,*" 18 Pepperdine L.Rev. 955, 995 (1991); C. Forsythe, "A Legal Strategy to Overturn *Roe v. Wade* After *Webster:* Some Lessons from Lincoln," 1991 B.Y.U.L.Rev. 519, 520–21 (1991); E. Brueschke & J. Brueschke, "Constitutional Law: The Future of the Abortion Controversy & the Role of the Supreme Court After *Webster v.*

*Reproductive Health Services,*" 43 Okla.L.R. 481, 513 (1990); W. Dellinger & G. Sperling, "Colloquy—Webster v. Reproductive Health Services: Abortion & the Supreme Court: The Retreat from *Roe v. Wade,*" 138 U.Pa.L.Rev. 83, 89 (1989); P. Prieto, "*City of Akron v. Akron Center for Reproductive Health, Inc.:* Stare Decisis Prevails, but for How Long?," 38 U. Miami L.Rev. 921, 938 (1984).

**6.** Thereafter, the Supreme Court decided *Ohio v. Akron Center,* 497 U.S. 502, ——, 110 S.Ct. 2972, 2979, 111 L.Ed.2d 405, 418 (1990) and *Rust v. Sullivan,* 500 U.S. ——, ——, 111 S.Ct. 1759, 1768, 114 L.Ed.2d 233, 250 (1991). The Supreme Court upheld a parent notification provision containing a by-pass provision in *Akron Center.* In *Rust,* the Supreme Court upheld regulations promulgated by the Department of Health and Human Services prohibiting grantees under Title X from engaging in abortion counseling, referral, and advocacy. These cases along with *Webster's.* apparent foreshadowing that the holding in *Roe* was subject to reexamination, left the constitutional issues presented by the initiative petition questionable.

uncertainty surrounding *Roe's* continuance as a rule of law can be seen by the vote in *Webster.* Five Justices—Chief Justice Rehnquist, Justices White and Scalia, who have consistently voted to overrule *Roe,* as well as Justices O'Conner and Kennedy—joined in part IID of the majority opinion criticizing *Roe.*[7]

After June 29, 1992, when the United States Supreme Court promulgated its opinion in *Planned Parenthood v. Casey,* — U.S. —, —, 112 S.Ct. 2791, 2815, 120 L.Ed.2d 674 (1992), co-authored by Justices O'Conner, Kennedy, and Souter,[8] which reiterates, and perhaps strengthens, the central premise of *Roe*—that women, may for some time period, make independent decisions to obtain nontherapeutic abortions—the submission could not go forward. *Casey* reaffirmed the central premise of *Roe v. Wade,* 410 U.S. 113, 153–54, 93 S.Ct. 705, 727, 35 L.Ed.2d 147, 177 (1973), *reh'g denied,* 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973), that the right of privacy founded in the Fourteenth Amendment's concept of personal liberty includes a woman's right to have an abortion. Five members of the *Casey* Court's precedential inquiry joined in part IIIA of the opinion which found that *"Roe's* underpinnings were unweakened in any way affecting its central principle" and that *Roe* was not "unworkable."[9]

The issue of the constitutionality of the initiative petition is governed by the United States Supreme Court's pronouncement in *Casey.* In this instance, the only course available to this Court is to follow what the United States Supreme Court, the final arbiter of the United States Constitution, has decreed.

In *Planned Parenthood v. Casey,* — U.S. —, —, 112 S.Ct. 2791, 2806, 120 L.Ed.2d 674 (1992), the United States Supreme Court framed the constitutional question as:

"... whether the State can resolve these philosophic questions in such a definitive way that a woman lacks all choice in the matter, except perhaps in those rare circumstances in which the pregnancy is itself a danger to her own life or health, or is the result of rape or incest...."

After considering the constitutional questions, the principles of institutional integrity, and the rule of stare decisis, the majority answered the question by concluding

---

**7.** The Court wrote in part IID of *Webster v. Reproductive Health Serv.,* 492 U.S. 490, 518, 109 S.Ct. 3040, 3052, 106 L.Ed.2d 410, 435–36 (1989):

"... We think that the doubt cast upon the Missouri statute by these cases is not so much a flaw in the statute as it is a reflection of the fact that the rigid trimester analysis of the course of a pregnancy enunciated in Roe has resulted in subsequent cases like Colautti and Akron making constitutional law in this area a virtual Procrustean bed.... We have not refrained from reconsideration of a prior construction of the Constitution that has proved 'unsound in principle and unworkable in practice'.... (T)he rigid Roe framework is hardly consistent with the notion of a Constitution cast in general terms, as ours is, and usually speaking in general principles, as ours does. The key elements of the Roe framework—trimesters and viability—are not found in the text of the Constitution or in any place else one would expect to find a constitutional principle. Since the bounds of the inquiry are essentially indeterminate, the result has been a web of legal rules that have become increasingly intricate, resembling a code of regulations rather than a body of constitutional doctrine...."

**8.** Our discussion of *Planned Parenthood v. Casey,* — U.S. —, —, 112 S.Ct. 2791, 2815, 120 L.Ed.2d 674 (1992), is predicated on what a majority of the United States Supreme Court concluded in parts I and II of the opinion. Justices Blackmun and Stevens joined the authors in these portions of *Casey* and in parts III, V–A, V–C, and VI. When an opinion is delivered by a divided United States Supreme Court, the rule for determining the holding of the Court is laid down in *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260, 265–66 (1977) in which the Court said:

"... When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds...."

In a judgment upholding a statute, the narrowest grounds are those which uphold the fewest statutes as constitutional. Conversely, when the rule is applied to striking down a statute, the narrowest grounds are those invalidating the fewest statutes as unconstitutional.

**9.** *Planned Parenthood v. Casey,* see note 8, — U.S. at — – —, 112 S.Ct. at 2810–13, supra.

that the essential holding of *Roe* should be both retained and reaffirmed. The *Casey* Court, after balancing the woman's liberty interest against the State's interest in fetal life, held that the line should be drawn at viability; that before that time the woman has a right to choose to terminate her pregnancy; and that, before viability, no state may deprive a pregnant woman of that right.[10] Five members of the Court agreed that:

"... It must be stated at the outset and with clarity that Roe's essential holding, the holding we reaffirm, has three parts. First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger a woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child. These principles do not contradict one another; and we adhere to each.... Constitutional protection of the woman's decision to terminate her pregnancy derives from the Due Process Clause of the Fourteenth Amendment. It declares that a State shall not 'deprive any person of life, liberty, or property, without due process of law.' The controlling word in the case before us is 'liberty.' ..."[11]

Initiative Petition No. 349 *criminalizes* and *absolutely prohibits* abortions except in four narrow circumstances: 1) grave impairment of the female's physical or mental health; 2) rape as defined in 21 O.S.1991 § 1111; 3) incest as defined in 21 O.S.1991 § 885; and 4) grave physical or mental defect of the fetus.[12] If the abortion does not fall within one of the exceptions, any person who performs or aids or abets in the performance of an abortion upon another person is punishable by up to four years imprisonment.[13] Initiative Petition No. 349 does not allow a woman to make a private decision to obtain an abortion *at any time during the pregnancy— either before or after viability*. It does not protect a woman's liberty interest as defined by *Casey*.

**10.** The United States Supreme Court upheld some restrictions on the right to obtain an abortion—an informed consent provision, a one-parent consent with a judicial by-pass procedure for minors, and a 24–hour waiting period— while preserving the basic right to obtain an abortion.

**11.** *Planned Parenthood v. Casey*, see note 8, —— U.S. at ——–——, 112 S.Ct. at 2802–06, supra.

**12.** Section 5 of the petition provides:

"Abortion shall not be a crime under the following circumstances:

(A)(1) The abortion was necessary to save the life of the female or to avoid a grave impairment of the female's physical or mental health;

(2) For the purpose of determining grave impairment of a female's mental health in Section 5(A)(1), impairments or stresses produced by an unwanted birth, social stigma or embarrassment, interruption of life plans, or lack of financial resources, which have not resulted in psychosis or major depressive illness, shall not constitute grave mental impairment;

(B) The pregnancy resulted from rape as defined by Title 21, Section 1111 of the Oklahoma Statutes;

(C) The pregnancy resulted from incest as defined by Title 21, Section 885 of the Oklahoma Statutes; or

(D) The unborn child would be born with a grave physical or mental defect."

**13.** Section 4 of the petition provides in pertinent part:

"(A) Except as provided in Section 5, a person commits the crime of abortion if:

(1) Such person performs an abortion upon another person; or ...

(2) Such person intentionally or knowingly aids or abets the performing of an abortion upon another person....

(B) Every natural person guilty of the crime of abortion is punishable by imprisonment in the penitentiary for not less than four (4) years.

(C) Any person, other than a natural person, guilty of the crime of abortion is punishable by a fine not less than Ten Thousand Dollars ($10,000.00) but not exceeding One Hundred Thousand Dollars ($100,000.00)."

■ Because the United States Supreme Court has spoken, this Court is not free to impose its own view of the law as it pertains to the competing interests involved. The Supremacy Clause of the United States Const. art. VI, cl. 2 provides:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; *and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.*" (Emphasis supplied.)

Likewise, the Oklahoma Constitution requires compliance with federal constitutional law on issues of federal law.[14] Art. 1, § 1 of the Okla. Const. provides that:

"The State of Oklahoma is an inseparable part of the Federal Union, and the Constitution of the United States is the supreme law of the land."

We are doubly bound to uphold the law of the land. Our limited role, like the role of all state courts in such cases, is to apply federal constitutional law, not to make it nor to guess what it may become.[15] By virtue of our constitutional oath of office,[16] we have solemnly sworn to uphold the Constitution of the United States. *Roe* and *Casey* may be overruled. The Freedom of Choice Act of 1992, now pending before Congress, which would codify *Roe*, may be enacted. Or, the proponents may present a proper petition for submission to a vote of the people. Speculation as to which of many paths the law in a given area will take in the future is a transparent veil behind which people act out their own policy preferences. "Guesses" about the future development of any rule of law have never been an acceptable rule of decision in Anglo American jurisprudence.

■ We will uphold the law of the land whatever it may be. Today, the law of the land is that a woman has a constitutionally protected right to make an independent choice to continue or to terminate a pregnancy before viability. Because viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions, and because women who do not fall within four narrowly defined categories may not exercise the pre-viability liberty interest recognized by *Casey*, we are compelled to find the initiative petition unconstitutional. Not quite two years ago, we defined our duty in *In re Initiative Petition No. 344*, 797 P.2d 326, 330 (Okla.1990) holding that:

"... This Court is the Protector of our Constitution. While the electorate has a constitutional right to amend the Oklahoma Constitution, it is this Court's responsibility to see the petitions for change actually reflect the voters intent and comply with the requirements set out in both the Constitution and the statutes. In this case, the requirements are simply not met."

The unconstitutional abortion ban is the cornerstone of Initiative Petition No. 349.[17] Without the inclusion of the petition's restrictions, the remainder of the proposed legislation is meaningless. Therefore, the existence of a severability provision is of no avail in the instant cause.[18] Neither can the Court rewrite the provision to ensure that it meets the constitutional requirements of *Casey*.[19] We are required to pre-

14. The Okla.Const. art. 1, § 1.

15. See, *State of Carolina v. Bailey,* 289 U.S. 412, 420, 53 S.Ct. 667, 670–71, 77 L.Ed. 1292, 1296 (1933); *McLin v. Trimble,* 795 P.2d 1035, 1038 (Okla.1990); *State v. Board of Control,* 83 So.2d 20, 23 (Fla.1955).

16. The Okla.Const. art. 15, § 1.

17. Section 5 of the petition, see note 12, supra.

18. See, *In re Initiative Petition No. 347,* 813 P.2d 1019, 1030 (Okla.1991); *In re Initiative Petition*

*No. 315,* 649 P.2d 545, 548 (Okla.1982); *Tulsa Exposition & Fair Corp. v. Board of County Comm'ns,* 468 P.2d 501, 507 (Okla.1970); *Battles v. State ex rel. Oklahoma Comm'n for Crippled Children,* 206 Okla. 444, 244 P.2d 320, 323–34 (1952); *Atchison, T. & S.F. Ry. v. Long,* 122 Okla. 86, 251 P. 486, 491–92 (1926).

19. Title 34 O.S.1991 § 10 provides in pertinent part:

"A. Any person who is dissatisfied with the wording of a ballot title may, within ten (10) days after the same is filed by the Attorney

serve a woman's right to make a decision to obtain an abortion before viability to maintain harmony with the law. This position is diametrically opposed to the proposal presented.

## II.

A PRE-SUBMISSION DETERMINATION OF THE CONSTITUTIONALITY OF THE INITIATIVE PETITION IS APPROPRIATE AND NECESSARY WHERE THE PROPOSAL IS FACIALLY UNCONSTITUTIONAL AND IS JUSTIFIED WHEN A COSTLY AND FUTILE ELECTION MAY BE AVOIDED.

Although the proponents continue to press for an election on the initiative petition, they apparently admit that the petition was unconstitutional under *Roe* when it was drafted and circulated, and that, if it were adopted by a vote of the people, it would be unconstitutional under *Roe* and *Casey.* The proponents claim that notwithstanding the facial unconstitutionality of Initiative Petition No. 349, the people should be permitted to vote because *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma,* 534 P.2d 3, 8 (Okla.1975) was wrongly decided, and additionally that the people have an absolute right to vote on any measure. The proponents urge us to allow a vote on the petition in order to present a "test case" urging the United States Supreme Court to overrule or to redetermine *Roe* and *Casey.*

The protestants, the Attorney General, and the amici charge not only that the measure is unconstitutional under *Casey,* but that to allow the question to appear on the November ballot would be to sanction a costly, divisive, and unnecessary election. The Attorney General, who may under certain circumstances have the duty of defending the measure if it were adopted by a vote of the people and subsequently challenged, asserts that such a measure cannot be defended because no principled argument can be made in its defense.

■ *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma,* 534 P.2d 3, 8 (Okla.1975), was decided seventeen years ago. Since then, this Court, in an unbroken chain of decisional law, has held that a determination on a constitutional question as to the legality of a measure proposed to be enacted into law by the people will be reached by this Court when raised by a party if, in the Court's opinion, reaching the issue may prevent the holding of a costly and unnecessary election. That finding has been reaffirmed by this Court on at least four subsequent occasions. *In re Initiative Petition No. 348,* 820 P.2d 772, 780 (Okla.1991); *In re Initiative Petition No. 347,* 813 P.2d 1019, 1030 (Okla.1991); *In re Initiative Petition No. 341,* 796 P.2d 267, 269 (Okla.1990); and *In re Initiative Petition No. 315,* 649 P.2d 545, 547–48 (Okla.1982) all solidly stand for the premise that if a properly preserved constitutional challenge is leveled at a proposed law and a ruling on the issue would prevent a useless election resulting in the enactment of an unconstitutional statute, this Court has the authority, as well as the responsibility, to decide the matter.

■ We cannot undervalue the importance of the constitutional right, under the Oklahoma Constitution, to initiative and referendum. Nor may we ignore our constitutional duty. In *Ralls v. Wyland,* 40 Okla. 323, 138 P. 158, 160 (1914), the Oklahoma Supreme Court held that:

"The powers of the initiative and the referendum reserved to the people occupy a prominent place in the Constitution and laws of this state, and their act, when invoking such powers, should be guarded by the courts, to the end that whatever is their due is kept inviolate. *In the exercise of such powers, it is necessary that the provisions of the*

General with the Secretary of State as provided for in Section 9 of this title, appeal to the Supreme Court by petition in which shall be offered a substitute ballot title for the one from which the appeal is taken. Upon the

hearing of such appeal, the court may correct or amend the ballot title before the court, or accept the substitute suggested, or may draft a new one which will conform to the provisions of Section 9 of this title...."

*Constitution should be adhered to."* (Emphasis supplied.)

The very first article of the Oklahoma Constitution and its very first section acknowledge that the "State of Oklahoma is an inseparable part of the Federal Union, and the Constitution of the United States is the supreme law of the land." The very first section of the Bill of Rights of the Okla.Const. art. 2, § 1 limits the right of the initiative. It provides:

"All political power is inherent in the people; and government is instituted for their protection, security, and benefit, and to promote their general welfare; and *they have the right to alter or reform the same whenever the public good may require it; Provided, such change be not repugnant to the Constitution of the United States."* (Emphasis supplied.)

The proponents eleventh hour revelation that they apparently knew that Initiative Petition No. 349 was unconstitutional when it was drafted, circulated, and submitted only serves to raise additional questions about its legitimacy. Were prospective signers of the proposition informed of its unconstitutionality, and of its strategic role in a long-range strategy of political advocacy i.e., its "test case" status? Or conversely, were the signers led to believe that they were supporting a proposition that would enjoy legal validity if adopted by the voters?

There is nothing in the ballot title or anywhere else in the record before us from which we can discern that the ballot title was "in harmony with the law," or that it is "legally correct." The argument that the proposition should be placed before the voters, notwithstanding that it violates the law of the land as expressed in *Casey*, raises the additional issue of the treatment of those citizens who may support state-imposed limitations on abortions, but who are not inclined to vote for an unconstitutional measure. The Okla.Const. art. 5, § 6 provides:

"Any measure rejected by the people, through the powers of the initiative and referendum, cannot be again proposed by the initiative within three years thereafter by less than twenty-five per centum of the legal voters." [20]

Although initiative voters always must face the dilemma posed by the three-year rule, this dilemma is unnecessarily sharpened by the proponent's insistence on the submission of a patently unconstitutional measure where defeat will impair the initiative rights of those supporters who also support constitutional government. While this Court cannot monitor every aspect of every initiative campaign, it can express its concern about a post-circulation concession of unconstitutionality and its impact on this vital component of our political democracy.[21]

The proponents appear to assert that this "absolute right" to vote is derived from the First Amendment to the United States Constitution. At the same time, they concede that the right of initiative does not arise from the United States Constitution. Indeed, only twenty-three of our sister states provide this constitutional right. It seems self-evident that the exercise of a non-federal right can be conditioned by the same state constitution that creates and confers it. In this instance, art. 2, § 1 of the Okla. Const. bars statutory enactments which violate the law of the land.

■ Assuming arguendo, the relevance of proponents' "core speech" argument in this context, it is obvious that these rights are not absolute. Judicial intervention to interdict a hypothetical state constitutional amendment prohibiting the free exercise of religion would "limit" the proponents "core speech" activities; however, no one would question the legitimacy of such a limitation.

We understand the proponent's characterization of their petition as "core political speech" as additional emphasis for the im-

---

**20.** Initially, pursuant to the Okla.Const. art. 5, § 2, only 8% of the legal voters are required to propose legislative measures, and 15% to propose constitutional amendments.

**21.** The Okla.Const. art. 5, § 8 states that: "Laws shall be provided to prevent corruption in making, procuring, and submitting initiative and referendum petitions."

portance of the initiative process and for placing the proposition on the November ballot—and not as an attempt to raise a First Amendment claim. It is, in effect, an argument that their "free speech" rights to advocate an unconstitutional law outweigh constitutional rights of all other Oklahomans that the Oklahoma Constitution should not be repugnant to the Constitution which we all share as Americans. The Oklahoma drafters were careful to frame a constitution which was in harmony with the constitution written by the founding fathers. Our reverence for the initiative rights guaranteed by the Oklahoma Constitution cannot be overstated. It is our profound belief that our rejection of the *Threadgill v. Cross*, 26 Okla. 403, 109 P. 558, 562 (1910) rule which held that the constitutionality of an initiative petition is not subject to review prior to its enactment by the voters, and our reaffirmation of constitutional lawmaking principles enhances those rights rather than diminishes them.

Not surprisingly, the proponents have not cited us to a single provision of federal or Oklahoma law which trammels their First Amendment rights under the federal constitution, and our own review discloses none. The proponents rely upon *Myer v. Grant*, 486 U.S. 414, 421, 108 S.Ct. 1886, 1891, 100 L.Ed.2d 425, 434–35 (1988) [22] for the proposition that a pre-submission judicial review of the constitutionality of Initative Petition No. 349 violates "core political speech" protected by the First Amendment. The reliance on *Myer* is misplaced. In *Myer*, the United States Supreme Court held that Colorado could not prohibit payment of persons hired to circulate initiative petitions. Here, the procedural issue of paying circulators is not presented. The manner in which the petition was circulated is not at issue. Nothing in this opinion

should be read to limit the content of any petition circulated. However, if an unconstitutional measure garners enough signatures to be presented to the people and is challenged on constitutional grounds, pre-submission judicial review is appropriate.[23]

This Court's action is not based on the content of the proponents' "speech"; rather, it responds to the lawfulness of that speech in the context of our fundamental law on initiative and referendum. Nothing in this Court's action precludes the proponents of legal limitations on abortion from bringing forward a proposal on that exact subject matter so long as the proposal conforms to the applicable legal requirements for initiative proposals. In this context, the most basic requirement of the Oklahoma Constitution is that the change in law petitioned for be compatible with the United States Constitution as construed by the United States Supreme Court. It should also be noted that the proponents of change in federal constitutional law are entirely free to exercise their First Amendment rights in the arenas where federal law is shaped.

■ We noted in *In re Petition No. 281, State Question No. 441*, 434 P.2d 941, 946 (Okla.1967) that the real purpose of an initiative petition is to secure a vote of the people upon a proposed law or constitutional amendment. We also expressed the view that the repeal of any conflicting provisions of the law in effect at the time the proposed law is to become effective as being merely incidental to the purpose of the petition. This is not what is before us here. The proponents apparently take the position that they are not attempting to amend Oklahoma law. The goal clearly implicit in their "test case" strategy is a change in federal constitutional law. The

---

22. The only other material presented by the proponents in support of the "core political speech" argument are Justice Scalia's dissenting opinion in *Planned Parenthood v. Casey*, see note 8, —— U.S. at ——, 112 S.Ct. at 2885, supra; and a concurring opinion authored by Chief Justice Opala in *In re Initiative Petition No. 347*, see note 18, 813 P.2d at 1040, supra. Neither of the positions expressed in these special writings

could garner a majority vote of either of the respective courts.

23. *In re Initiative Petition No. 348*, 820 P.2d 772, 780 (Okla.1991); *In re Initiative Petition No. 347*, see note 18, supra; *In re Initiative Petition No. 315*, see note 18, supra; *In re Supreme Court Adjudication of Petitions in Norman, Oklahoma*, 534 P.2d 3, 8 (Okla.1975).

initiative process guaranteed to our citizens by the Oklahoma Constitution was never intended to be a vehicle for amending the United States Constitution—nor can it serve that function in our system of government.[24]

■ The proponents also complain that because bills pending before the Legislature are not subject to pre-enactment judicial scrutiny for constitutional flaws, we should similarly defer consideration of this proposition until such time as the people have acted. This argument quite simply mixes apples and oranges, and it ignores the many longstanding and well-recognized differences between these two modes of lawmaking. Few, if any, of the pre-enactment requirements governing the initiative and referendum process are applicable to the legislative process, such as, for example:[25] circulating petitions, signature verifications, eighth-grade reading level of the ballot title, mandatory challenge periods, and submission to the Attorney General of the ballot title for review for "legal correctness." Likewise, many of the hurdles built into our legislative structure do not apply to initiatives and referenda: namely, passage by both houses, legislative committee consideration, and the availability of a gubernatorial veto. These are two very different processes and the proponents' efforts to confuse them are misplaced.

The proponents also claim that the proposal here is different from the *Casey* restrictions. Yes, it is. It is different, most significantly, in that Initiative Petition No. 349 is so much more restrictive that it could not be enforced in a manner consistent with the Liberty Clause of the Fourteenth Amendment. (Subject to some procedural restrictions, the Pennsylvania statute[26] reviewed in *Casey* did not ban first trimester abortions.)

Even though the proponents continue to cling to *Threadgill v. Cross*, 26 Okla. 403, 109 P. 558, 562 (1910), this Court implicitly recognized in 1975, that the *Threadgill* doctrine was frequently nothing more than a rationalization for deferring obvious issues of constitutionality. The effect of this doctrine, especially when it involves transparently unconstitutional proposals, is subject to the perception by the citizens of our state that their votes, so eagerly solicited, are ultimately meaningless acts in an elaborate charade. The danger of *Threadgill* is that, in effect, citizens may be led to believe that their votes on matters of intense public concern count, when this Court is already fully aware that the proposed measure is subject to being struck down as unconstitutional within months should the voters approve it. Conversely, the vote on an indisputably unconstitutional measure will almost certainly be distorted by widespread citizen awareness of the invalidity of the measure. In any event, a truly meaningful vote on the initiative becomes impossible.

The underlying sense of our cases dating back to 1975 is that *Threadgill* trumpets a triumph of form over substance which calls into question the very legitimacy of the initiative process itself by merely postponing the inevitable. For seventeen years, the majority of this Court has understood that the *Threadgill* doctrine has been modi-

---

**24.** The idea that proponents of change in the federal constitution can select their own means of doing so is not a new one. Although it dealt with a procedural issue, it is important to recognize that the United States Supreme Court and the Oklahoma Supreme Court acknowledge that the federal constitution cannot be amended other than as provided in the federal constitution. The Oklahoma Supreme Court in *State v. Morris,* 79 Okla. 89, 191 P. 364, 365 (1926) cited with approval *Hawke v. Smith,* 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871 (1920) when it refused to submit the 19th amendment (the prohibition amendment), which had been ratified by the Oklahoma Legislature, to a vote of the people. The *Morris* Court held that:

"Referendum provisions of state Constitutions and statutes cannot be applied in the ratification or rejection of amendments to the federal Constitution without violating the requirement of article 5 of such Constitution, that such ratification shall be by the Legislatures of the several states, or by conventions therein, as Congress shall decide."

**25.** See, 34 O.S.1991 § 9.

**26.** Title 18 Pa.Cons.Stat.Ann. § 3203 (Purdon 1982); 18 Pa.Cons.Stat.Ann. § 3211 (Purdon 1988).

fied to the extent that it no longer operates as a bar to the pre-submission review of constitutional defects in initiative proposals.

Here, the initiative petition makes no allowance for a woman's pre-viability decision on whether to obtain an abortion. If enacted, it could not withstand a *Casey*-based challenge; and, at best, it would serve as an expensive, non-binding public opinion poll. Were we to allow the initiative to be submitted to the people, a costly, fruitless, and useless election would take place. The pragmatic approach to the consideration of constitutional issues begun in *Norman* strengthens rather than impairs the initiative process because voters are assured that their vote on a state question is meaningful. The utilization of pre-submission constitutional scrutiny guarantees that Oklahomans are neither "cut off at the pass" nor engaged in a game of "Kings–X" after they have exercised their most precious right—the right to vote.

## CONCLUSION

The right of the initiative is precious and it is one which we are zealous to preserve to the fullest measure of the spirit and the letter of the law. All doubt as to the construction of pertinent provisions is resolved in favor of the initiative.[27] However, the right of the initiative is not absolute. There are constitutional and statutory limits on the process.[28] After *Casey*, it became incontrovertibly clear that the petition could not withstand a constitutional challenge. Although state law may afford

greater rights than those guaranteed by federal law, it may not curtail rights guaranteed by federal law or the United States Constitution.[29]

If the people of Oklahoma want to vote on a valid enactment concerning abortion, they have the constitutional right to circulate another petition. However, it would be a disservice to the proponents, to the protestants, and to the citizens of this state to hold an election which could not withstand the immediate *Casey* challenge which would be bound to follow. At that time, this Court would be forced to declare the enacted proposition unconstitutional. The legal resources of the parties, the people of Oklahoma, and the judiciary would be better spent in considering a petition which is not void on its face.

### INITIATIVE PETITION INVALID; ORDERED STRICKEN FROM THE BALLOT.

LAVENDER, SIMMS and SUMMERS, JJ., concur.

WATT, J., concurs in part I, concurs by reason of stare decisis in part II.

HODGES, V.C.J., and HARGRAVE, J., concur in part and dissent in part.

OPALA, C.J., and ALMA WILSON, J., dissent.

LAVENDER, Justice, concurring specially:

Once a determination is made the proposed statutory scheme involved here is

---

27. *Oliver v. City of Tulsa,* 654 P.2d 607, 613 (Okla.1982).

28. The United States Const. art. VI, cl. 2; Okla. Const., art. 1, § 1, art. 2, § 1 and art. 5, § 6; *In re Initiative Petition No. 344,* 797 P.2d 326, 330 (Okla.1990). See, *Community Gas & Serv. Co. v. Walbaum,* 404 P.2d 1014, 1016 (Okla.1965).

29. *Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983); *Pruneyard Shopping Center v. Robbins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040–41, 64 L.Ed.2d 741, 751–52 (1980). The following jurisdictions which have considered the issue of abortion have afforded greater individual rights to their citizens under state constitutions than those recognized under the federal constitution. *Preterm*

*Cleveland v. Voinovich,* 1992 LEXIS 1, 5 (Ohio Com.Pl.,1992); *Doe v. Maher,* 40 Conn.Supp. 394, 515 A.2d 134, 152 (1986); *Right to Choose v. Byrne,* 91 N.J. 287, 450 A.2d 925, 932 (1982); *Moe v. Secretary of Admin.,* 382 Mass. 629, 417 N.E.2d 387, 400 (1981); *Committee to Defend Reproductive Rights v. Myers,* 29 Cal.3d 252, 172 Cal.Rptr. 866, 625 P.2d 779, 796 (1981); *Doe v. Director of Dept. of Social Serv.,* 187 Mich.App. 493, 468 N.W.2d 862, 870 (1991); *Hope v. Perales,* 150 Misc.2d 985, 571 N.Y.S.2d 972, 979 (1991). We are not called upon here to do so, nor will we speculate concerning the scope of individual liberty under the Okla.Const. art. 2, § 2 or under the Okla.Const. due process clause, art. 2, § 7.

patently unconstitutional as violative of the United States Constitution as interpreted by the United States Supreme Court, the only further question we must decide is whether the people of Oklahoma have a right under either the Oklahoma Constitution or the First Amendment to the United States Constitution to vote on the enactment of a law which is violative of the fundamental law of our country. I do not believe the people have such a right under either the State or Federal Constitutions. What must be remembered here is that the right of initiative inuring in the people is a creature of our State Constitution and the State of Oklahoma, like the people which are its citizens, are a part of a larger whole, the United States of America. As such the State of Oklahoma and her citizens are subject to the supreme law of this country, the Constitution of the United States and the final arbiter of that document is the United States Supreme Court. This recognition has guided us well through most of our history as a nation and I believe it will continue to guide us well in the future. In essence, the recognition is that our country was founded upon and is guided by the rule of law. In that this Court is bound by the decisions of the United States Supreme Court in matters of federal constitutional interpretation and if the proposed enactment were voted into law we would be duty bound to strike down its central and primary provisions as violative of the United States Constitution in any post-election facial challenge, I concur in the Court's opinion invalidating the initiative petition before us and ordering the proposed question stricken from the ballot. Our determination to do so is not a new or novel one. *See In re Initiative Petition No. 344*, 797 P.2d 326 (Okla.1990); *In re Initiative Petition No. 342*, 797 P.2d 331 (Okla.1990); *In re Initiative Petition No. 314*, 625 P.2d 595 (Okla.1980) (all invalidated initiative petitions as violative of the one subject rule under State law). Although I dissented in each of these cases on the ground the proposed measures involved there did not violate the one subject rule, I did not question, as a majority of this Court did not, the authority of this Court to invalidate an initiative petition sought to be submitted to the people based on a constitutional infirmity.

Furthermore, we have squarely held a decision on a constitutional question as to the legality of a measure proposed to be enacted into law through the initiative process may be reached by this Court at the pre-election stage. *In re Initiative Petition No. 348*, 820 P.2d 772, 780 (Okla.1991) (whether proposed revenue raising provisions violate federal republican form of government guarantee); *In re Initiative Petition No. 341*, 796 P.2d 267, 269 (Okla.1990) (constitutional challenges under First Amendment to the United States Constitution and OKLA. CONST. art. IV, § 1, separation of powers); *In re Initiative Petition No. 315*, 649 P.2d 545, 547–548 (Okla.1982) (State constitutional challenges to initiative petition concerning horse racing). Although reasonable people may disagree as to whether we should exercise our authority to review facial constitutional challenges at the pre-election stage it is my view there is no inherent infirmity in our doing so. While it may be easier for us to simply decline to review the facial challenge now because we may then never be faced with having to decide the constitutionality of the proposed statutory scheme either because it may, in fact, not be enacted into law by the voters or, if it is, any post-election challenge may be brought in federal court rather than in the State court system, our responsibility as judges is not simply to take the easiest course. Accordingly, because we have the authority to decide the type of constitutional question presently before us and the proposed legislation sought to be enacted into law by the involved initiative petition is facially unconstitutional in violation of the United States Constitution I concur in the majority opinion to invalidate the initiative petition and to strike it from the ballot.

I am authorized to state SIMMS, KAUGER and SUMMERS, JJ., join in the views expressed herein.

SIMMS, Justice, concurring:

I concur fully in the majority opinion authored by Justice Kauger, and I join

those views expressed in the writing of Justice Lavender, but write briefly to address the dissenting views of the Chief Justice, Vice Chief Justice, and my colleague Justice Wilson.

The writing of both the Chief Justice and the Vice Chief Justice refer to Mr. Justice Blackmun's age and a potential or impending change in personalities on the Supreme Court of the United States. This approach, in my view, ignores the foundation of a stable and orderly system of justice as we know it in this country, *stare decisis*. By basing a conclusion which might or might not occur in the future to personalities on the high court, they stray from the steady course our ship of state has sailed for over two hundred years, that ours is a government of laws and not of men. We should not be a slave of *stare decisis* nor should we, as judicial officers, ignore *stare decisis* when the Supreme Court of the United States has spoken.

I also must respectfully disagree with the Chief Justice that this matter should be transferred to the Court of Criminal Appeals. The review of initiative petitions is vested both by Constitution and statutes in the Supreme Court. Title 34, O.S.1991, § 8; *In re Initiative Petition No. 314*, 625 P.2d 595, 607 (Okla.1981). There is no provision under Oklahoma law which authorizes review of initiative petitions by the Court of Criminal Appeals, which is one of limited jurisdiction. Such a transfer of this case at this stage of the proceedings is unprecedented in Oklahoma. We do not herein consider the appeal of a conviction or reserved question of law under a criminal prosecution, nor is this matter incidental to an appeal in a criminal case. The initiative petition to consider liquor by the drink, pari-mutuel betting, and an ethics commission each contained criminal penalties, but no one remotely considered transferring those cases to the Court of Criminal Appeals.

We are herein addressing a complex but yet very simple issue, i.e., whether or not this initiative petition comports with Federal constitutional law, and the law of the State of Oklahoma. The citizens of this state have reserved unto themselves by enactment of our constitution, the right to effect statutory or constitutional change through the initiative process. Art. 5, § 1, Okla.Const. However, the people have imposed upon themselves a restriction by approving Art. 2, § 1, Okla.Const., which reads "... Provided such change shall not be repugnant to the Constitution of the United States." This is the issue which this Court is duty bound to review, and not the Court of Criminal Appeals.

I am authorized to state that LAVENDER, KAUGER, and WATT, JJ., join with me in the views expressed in this concurring opinion.

HODGES, Vice Chief Justice, concurring in part, dissenting in part, with whom HARGRAVE, Justice, joins.

I dissented in this Court's decision to *sua sponte* direct the parties to brief the impact of *Planned Parenthood v. Casey*, —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), on the initiative petition. The issue of the constitutionality of the measure proposed by the initiative petition was not initially briefed by the parties. In fact, protestants withdrew their constitutional claims. Thus, the issue is not properly before the Court and should not be the determining factor in denying the people their right to vote.

The people have a constitutional right to vent their anger and frustration through the initiative process in an effort to effect change in their government. The proponents are correct that central core political issues such as abortion should be submitted to a vote of the people when presented by an initiative petition.

It appears that all parties in this case want the initiative petition submitted to a vote of the people only to be thwarted by this Court's *sua sponte* injection of the constitutional issues. A healing between competing sides of the abortion question may never be reached but perhaps, if allowed, a vote of the people could be a beginning.

*Casey* presents a United States Supreme Court bitterly fragmented over the continu-

ing viability of *Roe v. Wade.* *Casey* may or may not remain the law of the land.[1] Therefore, for all of the above reasons, I personally feel that it would be judicious to address the constitutionality of the measure after such time it may be approved by a vote of the people. But due to the rejection of this approach by my colleagues in a divided vote, I will address the constitutional issue before this Court.

I agree that the measure proposed by the initiative petition is unconstitutional. It draws no distinction between restrictions on the abortion of a viable fetus and a fetus in the initial stages of development as required by the United States Supreme Court in the cases of *Roe* and *Casey.* Proponents admit the proposed measure is unconstitutional and was intentionally drawn so it could be presented to the United States Supreme Court as a test case to overrule *Roe v. Wade.* If so, then this option is still open for them as a certiorari appeal to the United States Supreme Court.

Today's refusal by this Court to allow a vote on the initiative petition based on its unconstitutionality could be reviewed according to the United States Supreme Court's Rule 10. Subdivision 1(c) of that rule provides that a petition for certiorari review will be considered "when a state court ... has decided an important question of federal law which has not been, but should be settled by [the United States Supreme Court], or has decided a federal question in a way that conflicts with applicable decisions of [that] court." If, as proponents claim, the United States Supreme Court should be the court to examine the constitutionality of the measure, that Court may choose to do so by granting certiorari review of our decision today.

1. Justice Blackmun made the following observation in *Casey:*

> I am 83 years old. I cannot remain on this Court forever, and when I do step down, the confirmation process for my successor well may focus on the [abortion] issue before us today. That, I regret, may be exactly where the choice between the two worlds will be made.

ALMA WILSON, dissenting in part:

The course taken by the majority while claiming to adhere to the federal constitution actually violates our state constitution.[1] Today's exercise of judicial power interferes with the exercise of the political power of the people, acting as our legislative branch of state government. I refuse to join in this flagrant encroachment upon the people's legislative powers.

Oklahoma's constitution requires that the powers of the three branches of our state government be separate and independent. Article IV, § 1 provides:

> *The powers of government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial;* and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government *shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others.* (Emphasis added.)

The doctrine of separation of powers was recently considered by this Court in *State ex rel. York v. Turpen,* 681 P.2d 763, 767 (Okla.1984). In *York,* presented with the issue of the effect of an opinion of the Attorney General [an act of the executive branch of government] declaring a statute unconstitutional, we said:

> The true import of the doctrine of separation of powers is that the whole power of one department shall not be exercised by the same hands which possess the whole power of either of the other departments; and that no one department ought to possess *directly* or *indirectly* an overruling influence over the others. *Bailey v. State Board of Public Affairs,* 194 Okl. 495, 153 P.2d 235 (1944).

*Id.* at ——, 112 S.Ct. at 2854 (Blackmun, J., concurring in part, concurring in the judgment in part, and dissenting in part).

1. This initiative petition protest proceeding does not present an issue of irreconcilable conflict between federal constitutional jurisprudence and the state constitutional provisions. Federal constitutional law does not impose a duty upon this Court to review proposed legislation for possible violations of the federal constitution.

Recognizing the overruling effect of the A.G.'s opinion upon the legislative branch of government, this Court quoted *Threadgill v. Cross*, 26 Okla. 403, 109 P. 558, 562 (1910):

In the legislative department of the government is vested the power of enacting all laws. To that department is intrusted the determination of what laws shall be enacted, and what laws shall not be enacted. It must in the first instance determine whether a proposed measure is valid or invalid, and in doing so it will not be presumed that the members of that department, whether they be the electors at the polls, or the members of the Legislature, will enact or attempt to enact legislative measures that they know are violative of the state Constitution or of the federal Constitution, but that they will act from patriotic motives and endeavor to adopt such laws only as will best serve the public good, keeping in mind the limitation upon their powers fixed by the Constitution of the state and the federal Constitution as the supreme law of the land. When such department has acted upon a proposed measure and adopted same, it thereby becomes clothed with the presumption that it is a valid enactment and with its validity the executive and judicial departments have nothing to do, until it becomes the duty of these respective departments to partici-

pate in the construction or enforcement of such statute. The duty of determining what law shall be enacted and what law shall not be enacted rests neither upon the executive nor the judicial department.

*York,* 681 P.2d at 766.[2]

The majority opinion does not speak to the doctrine of separation of governmental powers. Notwithstanding this silence, the plain words of our state constitution forbid the use of judicial power to prevent or interfere with the legislative process invoked by the initiative petition.[3] The people created our state government for their protection, security, and benefit.[4] The people divided the powers of our state government into three separate, distinct and independent departments.[5] Legislative power is vested in the Legislature, but the people reserved to themselves the right to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature.[6] In our state constitution, the people reserved to themselves legislative power of the highest order; laws enacted by the people through the initiative process are not subject to the constitutional veto power of the Governor, nor are the effective dates of laws enacted by the people subject to the constitutional limitations placed on enactments of the Legislature.[7] Our state constitution recog-

---

2. The majority opinion does not modify *Threadgill* as an erroneous or obsolete interpretation of the separation of powers doctrine.

3. The ultimate responsibility for construction and interpretation of our law is with this Court. *Monson v. State ex rel. Oklahoma Corporation Commission,* 673 P.2d 839 (Okla.1983) and *York v. Turpen,* 681 P.2d at 767. And, when asked to construe a provision of our state constitution, the facially apparent meaning must be accepted by this Court. *Shaw v. Grumbine,* 137 Okla. 95, 278 P. 311 (Okla.1929).

4. Okla. Const., art. II, § 1 provides:
   *All political power is inherent in the people;* and government is instituted for their protection, security, and benefit, and to promote their general welfare; and *they have the right to alter or reform the same* whenever the public good may require it: Provided such change shall not be repugnant to the Constitution of the United States. (Emphasis added.)

5. Okla. Const., art. IV, § 1.

6. Okla. Const., art. V, § 1 provides:
   *The Legislative authority of the State shall be vested in a Legislature,* consisting of a Senate and a House of Representatives, *but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature,* and also reserve power at their own option to approve or reject at the polls any act of the Legislature. (Emphasis added.)

7. Okla. Const., art. V, § 3 provides in part:
   The veto power of the Governor shall not extend to measures voted on by the people.... Any measure referred to the people shall take effect and be in force when it shall have been approved by a majority of the votes cast thereon and not otherwise.... Petitions and orders for the initiative and for the referendum shall be filed with the Secretary of the State and addressed to the Governor of the state, who shall submit the same to the peo-

nizes that all political power is inherent in the people[8] and prohibits the use of any governmental power to interfere with the people's right to the franchise.[9] With these constitutional provisions, the people withheld from this Court the political power to scrutinize the initiative petition, to assist those proposing or opposing the initiative petition, or to direct the initiative process.[10]

I agree with the majority that "(t)he issue of the constitutionality of the initiative petition is governed by the United States Supreme Court's pronouncement in *Casey.*"[11] However, the real question presently before this Court is one of fundamental state law: Will this Court wield its power to supervise the legislative process invoked by initiative petition of the people? I do not agree with the majority's conclusion that in this case "the only course available to this Court is to follow what the United States Supreme Court, the final arbiter of the United States Constitution, has decreed."[12] The only course available to

---

**8.** Okla.Const., art. II, § 1.

**9.** Okla.Const., art. II, § 4 provides:

No power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage by those entitled to such right.

**10.** *Planned Parenthood v. Casey,* — U.S. —, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) went to the United States Supreme Court on a record made in several days of trial to the bench. Although complaining abortion clinicians challenged the facial validity of Pennsylvania law, the Supreme Court grounded its holdings in the evidentiary record presented. The pronounced "undue burden without due process of law" [14th Amendment violation] was expressly supported by the evidentiary record.

I refuse to speculate regarding the evidence that might be presented were the proposed measure in Initiative Petition No. 349, State Question No. 642 enacted into law and challenged in our courts.

**11.** Opinion, p. 5.

If enacted, the statutes proposed by the Initiative Petition No. 349, State Question No. 642 explicitly provide for interpretation and construction consistent with federal decisional law. The first two sections of the proposed measure state:

Section 1. Statement of Intent

It is the intention of the People of the State of Oklahoma to grant the right to life to all unborn humans and to restrict abortion to the full extent permitted by the *Constitution of the United States, the decisions of the United States Supreme Court, and federal statutes.* Section 2. Findings and Principles of State Law

(A) The people of the State of Oklahoma find by popular vote that:

(1) They desire to balance the rights of a pregnant female with the rights of her unborn child;

(2) The State of Oklahoma has a compelling interest in the sanctity of unborn human life;

(3) Childbirth is favored over abortion;

---

ple. The Legislature shall make suitable provisions for carrying into effect the provisions of this article.

(4) Great harm is caused by unrestricted abortions;

(5) The terms pregnancy "trimesters" and "viability" of unborn children are not found in the text of the United States Constitution:

(6) *The State of Oklahoma's compelling interest in protecting unborn human life does not come into existence only at the point of viability, and there is no rigid line distinguishing Oklahoma's right to restrict abortion either before or after viability;*

(7) The life of each human begins at fertilization;

(8) *The presence of a fertilized ovum in a female's body is the point at which Oklahoma's compelling interest in protecting unborn human life comes into existence;*

(9) Unborn children have protectable interests in life, health, and well-being; and

(10) The abortion issue should be resolved by a vote of the People of the State of Oklahoma.

(B) From the effective date of this Act, *the laws of the state of Oklahoma should be interpreted and construed* to acknowledge on behalf of an unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this State, *subject only to the Constitution of the United States, and decisional interpretations thereof by the United States Supreme Court.* (Emphasis added.)

Perusal of these two sections, in light of *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Planned Parenthood v. Casey,* indicates a likelihood that paragraphs numbered 6 and 8 of Section 2 would be stricken as unduly restrictive of a woman's constitutionally protected liberty interests. The majority opinion does not deal with the provisions set out above. Rather, the majority finds the provisions of the proposed measure which define crimes and impose criminal penalties to be contrary to *Casey.*

**12.** Opinion, p. 5.

The majority's conclusion is supported by erroneous and sensational legal findings that: 1) the unconstitutionality of the initiative petition

this Court is to determine the validity of the count of electors signing the initiative petition and the legality of the ballot title.[13]

If the people have secured sufficient, valid signatures of the registered electorate of this state to invoke their highest order of legislative power, then the people have a constitutional right to complete their legislative process by voting on Initiative Petition No. 349, State Question No. 642.[14] Submitting the petition to the people is not the "easy course", it is the only constitutional course.

> is manifest; 2) Oklahoma women who do not fall within four narrowly defined categories would be absolutely prohibited from exercising the pre-viability liberty interest expressly recognized by *Casey;* 3) "Initiative Petition No. 349 *criminalizes* and *absolutely prohibits* abortions except in four narrow circumstances ..."; and, 4) "Our limited role, like the role of all state courts in such cases, is to apply federal constitutional law, not to make it nor to guess what it may become."

**13.** The protest to the court of electors signing the initiative petition and the ballot title is before this Court pursuant to the special statutory proceedings established in 34 O.S.1992, §§ 1, et seq. This statutory proceeding does not invoke the extraordinary powers of this Court to do what is fair and just.

**14.** Relying on popular information, but without a single allegation nor any evidence, this Court determines that resolution of the constitutionality of the proposed measure will prevent a "costly" election. Assured of the upcoming general election in November, I doubt that printing of this state question on the November ballot would create any appreciable cost to the taxpayers of this state. The cost of government simply does not warrant judicial interference with the legislative process.

Further, it is the unique duty of judiciary to preserve our constitution and, when a legislative enactment conflicts with its provisions, to declare the statute unconstitutional. See: *Phillips v. Oklahoma Tax Commission,* 577 P.2d 1278 (Okla.1978) (declared 68 O.S.Supp.1977, § 1402a unconstitutional as a violation of the Commerce Clause of the United States Constitution because the statute placed an additional two percent use tax on tangible personal property purchased outside Oklahoma); *Woods Development Co. v. Meurer Abstract,* 712 P.2d 30 (Okla.1985) (declared 1 O.S.1981, § 7 [repealed 1984] unconstitutional because it set a mandatory fee schedule for abstractors and was vague, economically unreasonable and confiscatory thereby violating economic due process); *Board of Trustees of Police Pension v. Weed,* 719 P.2d 1276 (Okla.1986) (declared 11 O.S.1971, § 541p

I am authorized to state that OPALA, C.J., joins in this view.

OPALA, Chief Justice, dissenting.

This case is *not* about the status of the United States Constitution as the *supreme law* of the land;[1] *not* about the invalidity of *law* that is repugnant to the United States Constitution;[2] *nor* even about this court's power to invalidate constitutionally nonconformable *law.* The question before us is rather whether this court should free itself from the restraining hand of *Thread-*

> and Oklahoma City Code § 2–342 [1970] unconstitutional because they required forfeiture of a retired police officer's pension benefits when the officer was convicted of a felony and thereby violated Okla.Const. art. 2, § 15, which prohibited forfeitures of estates upon conviction of a crime); and, *Reynolds v. Porter,* 760 P.2d 816 (Okla.1988) (declared 76 O.S.1981, § 18 unconstitutional because the statute, which gave a three year limitation on certain damages in malpractice cases, violated Art. 5, §§ 6 and 59 of the Oklahoma Constitution). See also, *Jobe v. State,* 509 P.2d 481 (Okla.Crim.App.1973) (declared the Oklahoma anti-abortion statute, 21 O.S.1971, § 861, unconstitutional because it failed to recognize the pregnancy stage of the mother and other interests involved thereby violating the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States, citing *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 [1973] ).

Allowing the legislative branch of government, whether acting through the Legislature or the populace, the presumption that it seeks to adopt such laws only as will best serve the public good, keeping in mind the limitation upon their powers fixed by the Constitution of the state and the federal Constitution as the supreme law of the land, prevents unwarranted judicial encroachment upon the power of the legislative branch of government.

**1.** That status is secured by the terms of Art. 1, § 1, Okl.Const., which provide:

> "The State of Oklahoma is an inseparable part of the Federal Union, and the Constitution of the United States is the supreme law of the land."

**2.** That principle is dealt with in the terms of Art. 2, § 1, Okl.Const., which provide:

> "All political power is inherent in the people; and government is instituted for their protection, security, and benefit, and to promote their general welfare; and they have the right to alter or reform the same whenever the public good may require it: Provided, such change be not repugnant to the Constitution of the United States."

*gill*[3] to now impose constitutional orthodoxy *not only on law* that is in force but also on an as-yet-unenacted measure in the political process of initiative lawmaking. To this question I would give a categorically negative answer. The extratextual power of federal and state courts to invalidate law at variance with the constitution's command—now about 190 years old—may not be used to create a form of court-impressed censorship purging from open and public debate and excising from the marketplace of available ideas *novel* policy solutions that might meet with current judicial disfavor. Debates on constitutional issues are not judicially bannable from public fora nor are they outside the protection accorded political speech. Judicial pre-enactment scrutiny of proposed legislation for constitutional flaws raises an impermissible restraint on the free exercise of political speech.[4] The Basic Charter of this Nation's government, on which our legal order is rested, must not be misperceived as an infallible and hence unmentionable holy icon. Judges serve as stewards of constitutional purity *in law*, but *do not also function as government agents enforcing constitutional orthodoxy upon the political process of lawmaking.* Unlike *enacted law*, lawmaking in progress need not meet constitutional orthodoxy. The people of this State require no *official censor to give his imprimatur* for the *content* of a measure to be proposed by initiative petition.[5] The judiciary's self-imposed restraint from invading the arena of political decisionmaking should not be abandoned for the sake of preventing elections upon policy issues that courts may ultimately trump. Only in the clearest case of *firmly settled* and *stable* federal constitutional jurisprudence that *absolutely* condemns the proposed measure as facially impossible of enforcement, application or execution—and then *only* if the protestants have standing to complain of constitutional infirmity—would this court ever be justified in not clearing an initiative petition for submission to a vote of the people. *This case falls far short of that category.*

The court declares that the initiative measure under consideration—which would prohibit abortions except in four instances and would impose *criminal penalties* for the proposed law's violation—does not qualify for submission to a vote of the electorate because it affords pregnant women less rights than those guaranteed them by the United States Constitution in *Planned Parenthood v. Casey.*[6] The court waters down *Threadgill*, a vintage Oklahoma authority, which teaches that in advance of a measure's adoption as law an initiative petition's content may not be test-

3. *Threadgill v. Cross*, 26 Okl. 403, 109 P. 558 (1910).

4. Advocacy for or against a proposed law is the purest form of political speech. Restraint upon free speech is prohibited by the terms of Art. 2, § 22, Okl.Const., which provide in part:
   "Every person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right; ...."

5. The constitutional provisions governing the initiative and referendum are Art. 5, §§ 1–8, Okl.Const. Section 1 provides:
   "The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but *the people reserve to themselves the power to propose laws and amendments* to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature." (Emphasis added.)

In *Oklahoma Tax Commission v. Smith*, Okl., 610 P.2d 794, 807 (1980), we stated that Art. 5, §§ 1, 2 and 7, together "comprise an initiative system whereby both the people and the Legislature may propose legislation independently, and neither *can block the effort of the other during the process....*" Our teaching in *Smith* applies with equal force to bar judicial as well as legislative interference with initiative process. Courts should be loath to impose judicial restraint on the electorate's power to make law. As the Arizona Supreme Court aptly remarked in *State v. Osborn*, 16 Ariz. 247, 248, 143 P. 117, 118 (1914), to place court-imposed restrictions "would be tantamount to claiming the power of life and death over every initiated measure by the people. It would limit the right of the people to propose only valid laws, whereas the other lawmaking body, the Legislature, would go untrammeled as to the legal soundness of its measures."

6. —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

ed in a judicial forum for constitutional conformity.

Because the court's answer is contrary to that I would give today, I recede from its pronouncement. I would stand by the full force of *Threadgill* as viable precedent to protect the people from impermissible judicial restraint on free political speech; I would not let *Casey* trump this measure's submission because protestants' *Casey* challenge is barred by their lack of standing and by the prudential rule; I would scrutinize the initiative petition before us *but only* for compliance with the *sine qua non* procedural requirements for submission; I would hold today that if this measure is adopted, it will, when challenged on constitutional grounds, undergo the *Casey* test or some other test *then* in jurisprudential vogue.

# I

## LEGAL BARRIERS TO THE COURT'S USE OF THE *CASEY* TRUMP

### A.

### *THREADGILL* [7] AND ITS PROGENY

*Threadgill*, which enjoyed *full* and *unlimited* sway from 1910 until 1975,[8] teaches that an initiative petition need only pass a procedural threshold test to qualify for submission to a vote of the people. It must (a) be in substantial compliance with the *sine qua non procedural* requirements for submission and bear the requisite number of valid signatures, (b) address but a single subject[9] and (c) be upon a subject not explicitly excluded from the people's lawmaking power.[10] Unless a fatal procedural impediment be found, the petition must be

---

7. *Supra* note 3. My commitment to *Threadgill*, *supra* note 3, is reported in several prior decisions. *See In re Initiative Petition No. 348*, Okl., 820 P.2d 772, 781, 782 n. 4 (1991) (Opala, C.J., concurring in result); *In re Initiative Petition No. 347, State Question No. 639*, Okl., 813 P.2d 1019, 1037 (1991) (Opala, C.J., concurring); *In re Initiative Petition No. 349*, Okl., (No. 76,437, February 20, 1991) (Opala, C.J., concurring in part and dissenting in part); *In re Initiative Petition No. 341*, Okl., 796 P.2d 267, 275 (1990) (Opala, V.C.J., concurring in result); *In re Initiative Petition No. 317, etc.*, Okl., 648 P.2d 1207, 1222 (1982) (Opala, J., concurring in the judgment); *In re Initiative Petition No. 315, etc.*, Okl., 649 P.2d 545, 554–555 (1982) (Opala, J., concurring in result).

8. *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma*, Okl., 534 P.2d 3 (1975) [Norman]. As I view *Norman*, its teaching is consistent with *Threadgill* but its language a bit broader than the holding. To me, *Norman* trumped an initiative measure that dealt with a subject excluded from the power of initiative lawmaking. *My own analysis of Norman places that pronouncement well within Threadgill's rationale. Post–Norman cases appear to assume our total departure from the teaching of Threadgill.*

*Threadgill* continues to meet with approbation of the Nation's legal community. See the tentative report of the TIPS Task Force on Initiatives and Referenda (Tort and Insurance Practice Section of the American Bar Association), submitted August 11, 1992, where under subsection "B. Judicial Review of Proposal and Ballot Title" at page 14 the Task Force recommends that "[c]hallenges to the substance of the initiative

on general state or federal constitutional grounds should be permitted *only after the election on the initiative at issue*" (emphasis added) and then comments at page 17:

"*Judicial review should not be available at this stage, however, for challenges on the basis of general state or federal constitutional issues, for instance, a challenge that the proposal, if enacted, would deny certain persons due process of law. These challenges, which may affect the desirability of the proposal, but are not directed to the specific qualifications for a ballot issue, may more appropriately be brought when and if the electorate enacts the proposal.* While early determination of these issues may result in certain economies of judicial time if joined with other challenges, and would avoid the expenditure of funds for the election process on a proposition that is ultimately invalidated, the Task Force believed that these considerations were outweighed by a desire to avoid delay in the initiative campaign. Limiting litigation on these issues to post-election challenges is also consistent with the general principle that constitutional questions are to be avoided unless it is necessary to resolve them. Even where confronting constitutional issues seems inevitable, these questions should not usually be determined under conditions that permit only a limited time for reflection." (Emphasis mine.)

9. *In re Initiative Petition No. 344*, Okl., 797 P.2d 326, 330 (1990); *In re Initiative Petition No. 342*, Okl., 797 P.2d 331, 333 (1990).

10. *Norman, supra* note 8; *see also in this connection In re Initiative Petition No. 347, supra* note 7 (Opala, C.J., concurring).

cleared for a vote. All constitutional challenges to the content must await the measure's adoption as *enforceable law and be presented in the context of a lively forensic controversy between antagonistic adversaries with legal standing to press challenges.*[11]

*Threadgill* should be *kept in full force because it raises a necessary barrier of insulation between judicature and initiative lawmaking. The former is a function of judges, the latter of the people.*

## B.

### THE "PRUDENTIAL RULE"

The prudential rule of necessity, adhered to by all state and federal courts, *commands* that constitutional issues not be resolved in advance of strict necessity.[12] Pre-enactment testing of proposed legislation clearly offends the prudential rule. Measures in the process of lawmaking are not subject to court-enforced constitutional orthodoxy.

I would not today relax the prudential rule to consider the protestants' *Casey* challenge to an *unenacted* measure.

## C.

### PROTESTANTS LACK STANDING FOR A *CASEY* CHALLENGE

Were I now to depart from my firm commitment to *Threadgill*, I still could not join today's rush to a constitutional judgment. Protestants do not meet either the federal or the state standards for standing to press their *Casey* challenge. *No person can be adversely affected by, or have a litigable interest in, a measure that is not enforceable against anyone as law.* No showing of actual or threatened injury can be made *vis-a-vis* a measure that is not law.

## D.

### OKLAHOMA'S STANDING REQUIREMENTS

Standing, the legal right of a person to challenge the conduct of another in a judicial forum,[13] may be raised at any level of the judicial process or by the court on its own motion.[14] It must be predicated on interest that is "direct, immediate and substantial."[15] The concept of standing focuses on whether the party invoking the court's jurisdiction has a legally cognizable interest in the outcome of the controver-

**11.** *See* Grodin, *In Pursuit of Justice* at 106 (Univ. of Cal. Press 1989); Gordon and Magleby, Pre-Election Judicial Review of Initiatives and Referendums, 64 Notre Dame L.R. 298, 302 (1989); *see in this connection* Grossman, The Initiative and Referendum Process: The Michigan Experience, 28 Wayne L.Rev. 77, 111 (1981); Note, The Judiciary and Popular Democracy: Should Courts Review Ballot Measures Prior to Elections?, 53 Fordham L.Rev. 919, 921–22 (1985).

**12.** *In re Snyder*, 472 U.S. 634, 642–643, 105 S.Ct. 2874, 2880, 86 L.Ed.2d 504 (1985); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501–502, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1986); *I.N.S. v. Chadha*, 462 U.S. 919, 937, 103 S.Ct. 2764, 2776, 77 L.Ed.2d 317 (1983); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *In re Initiative Petition No. 347, State Question No. 639, supra* note 7 at 1037 (Opala, C.J., concurring); *Smith v. Westinghouse Elec. Corp.*, Okl., 732 P.2d 466, 467 n. 3 (1987); *Schwartz v. Diehl*, Okl., 568 P.2d 280, 283 (1977); *Dablemont v. State, Department of Public Safety*, Okl., 543 P.2d 563, 564–565 (1975); *see also Davis v. B.F. Goodrich*, Okl., 826

P.2d 587, 593–594 (1992) (Opala, C.J., concurring); *In re Initiative Petition No. 348, supra* note 7 at 781, 782 n. 4 (Opala, C.J., concurring in result); *Johnson v. Walters*, Okl., 819 P.2d 694, 708, 712 n. 26 (1991) (Opala, C.J., concurring in part and dissenting in part); *State ex rel. Okl. Bar Ass'n v. Lobaugh*, Okl., 781 P.2d 806, 813 (1988) (Opala, J., dissenting); *In re Initiative Petition No. 341, supra* note 7 at 275 (Opala, V.C.J., concurring in result).

**13.** *State ex rel. Cartwright v. Okl. Tax Com'n*, Okl., 653 P.2d 1230, 1232 (1982); *Matter of Adoption of Baby Boy D*, Okl., 742 P.2d 1059, 1062 (1987). "... [T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 497, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

**14.** *Matter of Estate of Doan*, Okl., 727 P.2d 574, 576 n. 3 (1986) .

**15.** *Underside v. Lathrop*, Okl., 645 P.2d 514, 517 (1982); *Democratic Party of Oklahoma v. Estep*, Okl., 652 P.2d 271, 274 n. 13 (1982); *Matter of Estate of Doan, supra* note 14 at 576.

sy.[16] A party seeking relief must show actual or threatened injury of some kind.[17] The inquiry is whether *the party has in fact suffered injury to a legally protected interest within the contemplation of statutory or constitutional provisions.*[18] Under these standards of our law protestants lack standing to assert a *Casey* challenge to an *unenacted* initiative measure.

### E.

### FEDERAL STANDING REQUIREMENTS

The standing doctrine imposes two types of restrictions on litigants seeking access to federal courts: "constitutional limitations on federal courts' jurisdiction and prudential limitations on its exercise."[19] "In its *constitutional dimension,* standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit."[20] The requirement is met where the plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action...."[21] The *prudential aspect* of the standing inquiry, like the constitutional aspect, derives fundamentally from "concern about the proper—and properly limited—role of the courts in a democratic society."[22] Generally, the plaintiff can only assert "his or her own legal interests, and cannot rest his claim to relief on the legal rights or interests of third parties."[23] These limitations assure that a court does not issue "unnecessary pronouncement[s]" on constitutional issues[24] and that the issues before the court "will be concrete and sharply presented."[25]

Federal standing requirements are aptly illustrated in *Poe v. Ullman*[26] and *Tileston v. Ullman.*[27] There the Court dismissed appeals on nonjusticiability and lack-of-threatened-prosecution grounds. The *Poe* plaintiffs sought to enjoin the enforcement of a criminal statute prohibiting the sale of contraceptives. *Poe* teaches that a litigant must show a threat of prosecution that is both real and immediate before a federal

**16.** Application of *State ex rel. Dept. of Transp., Okl.,* 646 P.2d 605, 609 (1982); *Estep, supra* note 15; *Cartwright, supra* note 13 at 1232; *Independent School Dist. No. 9 v. Glass,* Okl., 639 P.2d 1233, 1237 (1982); *Doan, supra* note 14 at 576. "... [W]hen standing is placed in issue in a case, the question is whether the person whose standing is challenged, is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." *Flast v. Cohen,* 392 U.S. 83, 99–100, 88 S.Ct.1942, 1952, 20 L.Ed.2d 947 (1968); *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

**17.** *O'Shea v. Littleton,* 414 U.S. 488, 493–494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974).

**18.** *Matter of Adoption of Baby Boy D, supra* note 13 at 1062; *Independent School Dist. No. 9 v. Glass, supra* note 16 at 1237.

**19.** *Warth, supra* note 13, 422 U.S. at 499, 95 S.Ct. at 2205.

**20.** *Warth, supra* note 13, 422 U.S. at 498, 95 S.Ct. at 2205; *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976).

**21.** *Warth, supra* note 13, 422 U.S. at 499, 95 S.Ct. at 2205) (*citing, Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148–1149, 35 L.Ed.2d 536 (1973)); *see, e.g., Data Processing*

*Service v. Camp,* 397 U.S. 150, 151–154, 90 S.Ct. 827, 829–830, 25 L.Ed.2d 184 (1970). The constitutional prong requires, at the very least, an actual injury redressable by the court. *Director, Office of Workers' Comp. Programs v. Perini North River Assocs.,* 459 U.S. 297, 305, 103 S.Ct. 634, 641, 74 L.Ed.2d 465 (1983).

**22.** *Warth, supra* note 13, 422 U.S. at 498, 95 S.Ct. at 2205; *see Tileston v. Ullman,* 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943).

**23.** *Warth, supra* note 13, 422 U.S. at 499, 95 S.Ct. at 2205, citing, *Tileston, supra* note 22, and *United States v. Raines,* 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). The harm asserted cannot be a generalized grievance shared by the majority of the populace. *Warth, supra* note 13.

**24.** *Secretary of State of Md. v. J.H. Munson Co.,* 467 U.S. 947, 955, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984).

**25.** *Munson, supra* note 24, 467 U.S. at 955, 104 S.Ct. at 2846, citing *Baker v. Carr, supra* note 16, 369 U.S. at 204, 82 S.Ct. at 703.

**26.** 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961).

**27.** *Supra* note 22.

court may examine the validity of a criminal statute.[28] There, nonjusticiability came to be rested on two factors—only one attempt to enforce the offending ban had been made during its seventy-five year history and the contraceptives were "commonly and notoriously sold in Connecticut drug stores." [29] If the Court in *Poe* refused to test the constitutionality of a criminal statute that went unenforced and "stood toothless" for decades, *with what show of reason can this court today allow itself to probe into a measure that is not even law? Tileston,*[30] which is authority for the general and well-recognized principle that a litigant cannot have standing based upon the assertion of others' rights,[31] was reinforced in *Warth v. Seldin.*[32] There the Court states that "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, ... the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." [33]

**28.** In *Poe* the Court held the constitutional challenge to a Connecticut penal statute banning the use of contraceptives presented no controversy justifying the adjudication of a constitutional issue. The plurality opinion based the appeal's dismissal on nonjusticiability for lack of a real and immediate threat of prosecution. Another opinion deemed the appeal to be dismissable for want of ripeness. Whether for want of justiciability or ripeness, the majority in *Poe* clearly found that case unfit for judicial consideration as a controversy. The appellants' (married couples and their physician) complaints in these state declaratory judgment proceedings were held not to allege a threat of prosecution for use of or for giving advice concerning contraceptive devices. The allegations referred to a prosecutor's statement that he intends to prosecute any breach of state law and to his claims that use of and advice concerning contraceptives would constitute criminal offenses. The lack of immediacy of the threat described by these allegations, the Court opined, might alone raise serious questions of nonjusticiability of appellants' claims. *See United Public Workers of American (C.I.O.) v. Mitchell,* 330 U.S. 75, 88, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1946).

**29.** *Poe, supra* note 26, 367 U.S. at 502, 81 S.Ct. at 1755.

**30.** *Supra* note 22.

**31.** There, a physician sought judgment declaring the state anti-abortion statute unconstitutional because it endangered the lives of certain of his patients and thereby violated their 14th Amendment rights. The U.S. Supreme Court dismissed the physician's appeal for lack of standing because he was not suing to vindicate his own legal rights under state law, but rather those of his patients. The physician alleged (a) that the statute, if applicable to him, would prevent his giving professional advice concerning the use of contraceptives to three patients whose health condition was such that their lives would be endangered by childbearing and (b) that the appellees, state law enforcement officers, intend to prosecute any offense against the statute and "claim or may claim" that the proposed professional advice would constitute such an offense.

The complaint set out in detail the danger to the lives of the physician's patients in the event that they should bear children, *but contained no allegations asserting any claim under the 14th Amendment of infringement of the physician's liberty or his property rights.* In *Tileston,* the Court observed that "[t]he sole constitutional attack upon the statutes under the Fourteenth Amendment is confined to their deprivation of life—*obviously not [the physician's] but his patients'.* There is no allegation or proof that appellant's life is in danger. His patients are not parties to this proceeding and there is no basis on which we can say that he has standing to secure an adjudication of his patients' constitutional right to life, which they do not assert in their own behalf." *Tileston, supra* note 22, 318 U.S. at 46, 63 S.Ct. at 494.

**32.** *Supra* note 13.

**33.** *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982) (quoting *Warth,* supra note 13, 422 U.S. at 499, 95 S.Ct. at 2205); *United States v. Raines, supra* note 23, 362 U.S. at 22, 80 S.Ct. at 523 (a litigant must generally assert his own constitutional rights and immunities). Without such limitations "the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Warth, supra* note 13, 422 U.S. at 500, 95 S.Ct. at 2206.

*Justice Black's observations in* Younger v. Harris, *401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971),* are especially pertinent to this controversy:

"Ever since the Constitutional Convention rejected a proposal for having members of the Supreme Court render advice concerning pending legislation it has been clear that, even when suits of this kind involve a 'case or controversy' sufficient to satisfy the requirements of Article III of the Constitution, *the task of analyzing a proposed statute, pinpointing its deficiencies, and requiring correction of*

*Poe* and *Tileston* illustrate that standing requires a "Hohfeldian plaintiff"—i.e., one with a personal interest that is threatened by the state.[34] These protestants are non-Hohfeldian plaintiffs because they have no personal interest endangered by the unenacted measure.[35] They are not women whose intended termination of pregnancy is immediately threatened or impaired by state action in enforcing a constitutionally infirm criminal statute. I would not relax our standing requirements, identical to those in federal courts, to entertain the protestants' *Casey* challenge.

## II

WERE I NOW TO DEPART FROM MY UNSWERVING COMMITMENT TO *THREADGILL* AND WERE I ALSO TO IGNORE OUR STANDING DOCTRINE AND THAT OF THE UNITED STATES SUPREME COURT, I STILL COULD NOT JOIN THE COURT'S OPINION BECAUSE *PRIMARY JURISDICTION* OVER THE CONSTITU-

TIONAL VALIDITY OF THIS PROPOSED PENAL ANTI–ABORTION MEASURE IS REPOSED BY LAW IN THE COURT OF CRIMINAL APPEALS

### A.

THE PROPOSED ANTI–ABORTION MEASURE IS A PENAL STATUTE WHOSE CONSTITUTIONAL FITNESS LIES WITHIN THE *EXCLUSIVE* JURISDICTION OF THE COURT OF CRIMINAL APPEALS

There is another reason to defer this measure's consideration for constitutional testing until its adoption as law. The measure tested today in advance of its passage is at best a penal statute[36] whose constitutional fitness lies within the exclusive jurisdiction of the Court of Criminal Appeals.[37]

Extant Oklahoma case law gives a clear exposition of the dichotomy that governs our civil and criminal appellate cognizance.[38] The Court of Criminal Appeals

---

*these deficiencies before the statute is put into effect, is rarely if ever an appropriate task for the judiciary." Id.,* 401 U.S. at 52–53, 91 S.Ct. at 754 (emphasis added).

**34.** "In a suit [against the Governor] for accounting [of expenditures from his legislative mansion allowances] petitioners [news reporters] would occupy the status of so-called 'non-Hohfeldian' plaintiffs, i.e. persons whose interest tendered for judicial vindication is neither personal nor proprietary." *Oklahoma City News Broadcasters Ass'n v. Nigh,* Okl., 683 P.2d 72, 78 n. 2 (1984) (Opala, J., concurring in result); *see Flast v. Cohen, supra* note 16, 392 U.S. at 119, 88 S.Ct. at 1962 n. 5 (Harlan, J., dissenting).

**35.** There is a very narrow exception to the requirement for a Hohfeldian plaintiff—a taxpayer who complains of an unconstitutional tax levy. *See Flast v. Cohen, supra* note 16. The protestants in this abortion petition do not bring themselves within the narrow exception to the requirement for a Hohfeldian plaintiff.

**36.** Section 4 of the proposed initiative measure provides:

"Section 4. *Crime of Abortion* and Punishments
(A) Except as provided in Section 5, a person commits the *crime of abortion* if:
 (1) Such person performs an abortion upon another person; or

(2) Such person intentionally or knowingly aids or abets the performing of an abortion upon another person.
(B) Every natural person guilty of the *crime of abortion* is *punishable by imprisonment* in the penitentiary for not less than four (4) years.
(C) Any person, other than a natural person, guilty of the *crime of abortion* is *punishable by a fine* not less than Ten Thousand Dollars ($10,000.00) but not exceeding One Hundred Thousand Dollars ($100,000.00)." (Emphasis mine.)

**37.** *See State ex rel. Henry v. Mahler,* Okl., 786 P.2d 82, 85–86 (1990); *Carder v. Court of Criminal Appeals,* Okl., 595 P.2d 416, 419 (1979); *Anderson v. Trimble,* Okl., 519 P.2d 1352, 1355 (1974); *Hinkle v. Kenny,* 178 Okl. 210, 62 P.2d 621, 622 (1936). *See also Walters v. Oklahoma Ethics Com'n,* Okl., 746 P.2d 172, 180 n. 8 (1987) (Opala, J., concurring). The Court of Criminal Appeals is not an utter stranger to appellate judicature addressing the validity of a criminal statute dealing with abortion. *See, e.g., Jobe v. State,* Okl.Cr., 509 P.2d 481 (1973).

**38.** Oklahoma jurisprudence is based on judicial construction of Art. 7, § 4, Okl.Const., as well as on similar language of its pre–1967 counterpart in Art. 7, § 2, Okl. Const. The earlier version of § 2 was repealed by the 1967 amendment of Article 7, Okl.Const. (State Question No. 448, Legislative Referendum No. 164, adopted at election held July 11, 1967).

has the *exclusive* power over matters incident or essential to the complete exercise of its appellate jurisdiction in criminal cases.[39] In *Walters v. Ethics Com'n.*[40] we abstained from taking jurisdiction over a matter relating substantially to criminal law or procedure. Final decisions upon the meaning of a penal enactment may not be made by any appellate tribunal other than the Court of Criminal Appeals.[41] This applies with equal force to a criminal-law measure in progress of adoption by the initiative process.

## B.
## WHEN ON APPEAL OR IN AN ORIGINAL PROCEEDING AN ISSUE WHICH LIES WITHIN ANOTHER COURT'S JURISDICTION IS RAISED, IT MUST BE REFERRED TO THAT COURT UNDER THE PRIMARY JURISDICTION DOCTRINE

If this court should continue to test for constitutional conformity unenacted penal measures in initiative lawmaking process, it should defer the question at hand to the Court of Criminal Appeals. Two constitutional power sources would allow a criminal-law issue properly before us to be deferred to the Court of Criminal Appeals—Art. 7, § 6,[42] and Art. 7, § 4, Okl.Const.[43]

The terms of Art. 7, § 4, Okl.Const., provide in pertinent part:

"The appellate jurisdiction of the Supreme Court shall be coextensive with the State and shall extend to all cases at law and in equity; *except that the Court of Criminal Appeals shall have exclusive appellate juridiction in criminal cases until otherwise provided by statute* and in the event there is any conflict as to jurisdiction, the Supreme Court shall determine which court has jurisdiction, and such determination shall be final...." (Emphasis mine.)

*See Hinkle v. Kenny, supra* note 37 at 622; *Anderson v. Trimble, supra* note 37; *Corley v. Adair County Court,* 10 Okl.Cr. 104, 134 P. 835, 836 (1913).

**39.** *See Hinkle v. Kenny, supra* note 37 at 622, where this court reiterated its settled policy to follow the decisions of the Court of Criminal Appeals in matters of criminal law and *the construction of criminal statutes.* The stated purpose of this policy is to avoid "a conflict of opinions and decisions between the two courts." *See also State ex rel. Henry v. Mahler, supra* note 37 at 85–86; *State ex rel. Ikard v. Russell,* 33 Okl. 141, 124 P. 1092 (1912); *Ex parte Buchanan,* 113 Okl. 194, 240 P. 699 (1925); *Ex parte Meek,* 165 Okl. 80, 25 P.2d 54 (1933). In *Ex parte Meek, supra* 25 P.2d at 56, we said:

"Separate courts for the trial of criminal cases are common, as are separate appellate courts to entertain appeals in cases falling within these respective divisions. The settled and reasonable policy of the law is that there should be no conflicts in their jurisdictions or in their acts or decisions, where such conflicts are avoidable. The makers of our Constitution had this policy in mind and so indicated that this was their mind by using the term 'exclusive appellate jurisdiction in criminal cases' when they prescribed the jurisdiction to be given to the Criminal Court of Appeals." The Court of Criminal Appeals in *Corley v. Adair County Court, supra note* 38 134 P. at 836, acknowledged this doctrine, relying upon the principle that two bodies of equal density cannot occupy the same space at the same time.

**40.** *Supra* note 37. In *Walters* the court abstained from deciding whether certain non-bank loans violated the Oklahoma Ethics Commission Act. Our refusal to there grant declaratory relief was rested on well-established principles of deference which must always control orderly interaction of civil remedies with criminal process.

**41.** *Ex parte Anderson,* 33 Okl. 216, 124 P. 980, 981 (1912); *Ex parte Meek, supra* note 39; *Hinkle v. Kenny, supra* note 37; *see Ex parte Barnett,* 180 Okl. 208, 69 P.2d 643, 644 (1937); *Corley v. Adair County Court, supra* note 38; *Hurst v. Pitman,* 90 Okl.Cr. 329, 213 P.2d 877, 882 (1950).

**42.** The pertinent terms of Art. 7, § 6, Okl.Const., are:

"Except with reference to the Senate sitting as a Court of Impeachment and the Court on the Judiciary, *general administrative authority over all courts in this State ... is hereby vested in the Supreme Court* and shall be exercised by the Chief Justice in accordance with its rules...." (Emphasis mine.)

**43.** For the text of Art. 7, § 4, Okl.Const., *see supra* note 38.

Section 6, which makes the Court of Criminal Appeals subject to the administrative control of the Oklahoma Supreme Court, gives us the authority to transfer either a whole case or a part of one. Under § 4's constitutionally mandated division of appellate cognizance, whenever there is a dispute over a jurisdictional issue, this court decides which of the two tribunals shall take jurisdiction over the case.[44]

Our authority to certify an issue to another court may be likened to the *primary jurisdiction doctrine* that governs the allocation of cognizance between a federal court and one of the government's administrative agencies.[45] Primary jurisdiction doctrine is used where a *claim is originally cognizable in federal courts*. It comes into play whenever enforcement of the claim requires *issues to be resolved which have been placed within the special competence and specialized knowledge of an administrative body*.[46] A district court's judicial process will be suspended pending disposition of the deferred issues by the administrative body.[47] This court appears to have invoked the primary jurisdiction doctrine without adopting it by name.[48]

Here, the doctrine of primary jurisdiction should be crafted to facilitate our jurisdictional co-existence with the other appellate court of last resort. The doctrine's application would be necessary for this court to continue dealing with disputes which, although generally within its cognizance, call for a criminal-law analysis. An initiative petition contest is noncriminal. It cannot be transferred to the Court of Criminal Appeals. But the criminal-law aspect of this anti-abortion measure must undergo the other court's criminal-law analysis. Its answer should be binding on us here.

The court invalidates today a proposed criminal statute. It could with no less show of reason also claim for itself the authority *to validate* a penal enactment. In so doing it might run into conflict with a later contrary pronouncement of the Court of Criminal Appeals. Wisdom counsels a course that would defer the criminal-law aspect of the *Casey* trump to the Court of Criminal Appeals.

## III

## CONSTITUTIONAL ORTHODOXY MAY NOT BE IMPRESSED ON THE POLITICAL PROCESS OF INITIATIVE LAWMAKING

The process of changing statutory law or the state's constitution by initiative petition is a form of lawmaking. Lawmaking is a political process. Judges cannot police or censor that process for conformity to the constitution without raising an impermissible restraint on free exercise of political speech.[49] Initiative process *is not misused* when it is invoked to advocate changes in the federal constitutional jurisprudence or to influence and press for congressional amendments to the United States Constitution. Even if *Casey* were to prove itself immortal and immutable, a popular assault on the *Casey* citadel is well within the protection of Art. 5, §§ 1–8, Okl. Const.— the state constitutional provisions for initiative lawmaking. Today's opinion impermissibly imposes the rigidity of the current constitutional orthodoxy on the use of ini-

**44.** *Carder, supra* note 37 at 420.

**45.** *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 63, 77 S.Ct. 161, 164, 1 L.Ed.2d 126 (1956); *Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 303–305, 96 S.Ct. 1978, 1986–1987, 48 L.Ed.2d 643 (1976); *Maislin Industries, U.S. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 2762, 111 L.Ed.2d 94 (1990); *Sears, Roebuck & Co. v. San Diego Cty., etc.,* 436 U.S. 180, 199, 98 S.Ct. 1745, 1758, 56 L.Ed.2d 209 (1978). "'The doctrine of primary jurisdiction does not necessarily allocate power between courts and agencies, for it governs only the question whether the court or agency will *initially* decide a particular issue, not the question whether court or agency will *finally* decide the issue.'" *Sears,*

*supra,* 436 U.S. at 199, 98 S.Ct. at 1758 n. 29, quoting Professor Davis, 3 K. Davis, Administrative Law Treatise § 19.01, p. 3 (1958) (emphasis in original).

**46.** *United States v. Western Pacific Railroad Co., supra* note 45; *Nader v. Allegheny Airlines, Inc., supra* note 45.

**47.** *United States v. Western Pacific Railroad Co., supra* note 45.

**48.** *Stipe v. Theus,* Okl., 603 P.2d 347, 349–350 (1979).

**49.** For the terms of Art. 2, § 22, Okl. Const., *see supra* note 4.

tiative process and prevents the people from having access to that genre of law-making as a legitimate means of testing the continued popularity of current political values to effect their legitimate change. Neither the federal constitution nor the United States Supreme Court's exposition of that document is set in permanent stone. Today's disregard for *Threadgill's* rationale gives less latitude to the electorate's effort at lawful change by political advocacy than does our own code of ethics for lawyers. That code specifically protects from judicial sanction a lawyer's advocacy for a reasonable "extension, modification, or reversal of existing law." [50] We thus give lawyers a wider sweep of First Amendment freedom than we do to the sovereign electors of Oklahoma acting in the exercise of initiative lawmaking power. By denying their quest for an opportunity to test the constitutional frontiers of *Roe* [51] and *Casey* [52] the court deprives these proponents of a legitimate means by which to press political advocacy.

Today's decision *trumps political process rather than law*. Public debate on an unenacted measure and the electorate's claim to its adoption is every bit as protected by § 22 [53] as is a proposed bill before either of the two legislative chambers. Although today's axe strikes at a measure initiated outside the legislative chambers, the principle the court announces arms it with power also to require fundamental-law conformity—to be enforced without the usual procedural safeguards of the prudential rule and of standing requirements—of a bill in progress of enactment or of a state constitutional amendment proposed by the legislature under Art. 24, § 1, Okl. Const. [54]

Our fundamental law explicitly proscribes judicial tinkering with the election process. Art. 3, § 5, [55] and Art. 2, § 4, Okl. Const. [56] These constitutional provisions protect both the election and the right of franchise from excessive use of judicial

**50.** Rule 3.1, Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A, provides in pertinent part:

"A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a *good faith argument for an extension, modification or reversal of existing law....*" (Emphasis added.)

The pertinent terms of 12 O.S.1991 § 2011 are:

" * * * The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a *good faith argument for the extension, modification, or reversal of existing law....*" (Emphasis added.)

Federal Rule 11, Federal Rules of Civil Procedure, states in part:

" " * * * The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a *good faith argument for the extension, modification, or reversal of existing law....*" (Emphasis added.)

**51.** 410 U.S. 113, 163–64, 93 S.Ct. 705, 731–732, 35 L.Ed.2d 147, 182–183 (1973).

**52.** *Supra* note 6.

**53.** For the terms of Art. 2, § 22, Okl. Const., see *supra* note 4.

Our constitution's initiative provisions not only guarantee the right to vote on a proposed measure, they also afford the people a valued opportunity to ventilate—i.e., to air issues in a free political debate. This court has a constitutionally mandated duty to uphold and safeguard free pre-election ventilation of political views. *See In re Initiative Petition No. 314*, Okl., 625 P.2d 595, 613 (1981) (Opala, J., concurring), where I observe that a measure's submission *too close* to an election would deprive its proponents as well as the contestants of a fundamental right to inform the public about the merits and demerits of the issue before the electorate.

**54.** The terms of Art. 24, § 1, Okl. Const., provide in part:

"Any amendment or amendments to this Constitution may be proposed in either branch of the Legislature ... and referred ... to the people for their approval or rejection...."

**55.** Art. 3, § 5, Okl. Const., provides:

"All elections shall be free and equal. No power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage, and electors shall, in all cases, except for treason, felony, and breach of the peace, be privileged from arrest during their attendance on elections and while going to and from the same."

**56.** Art. 2, § 4, Okl. Const., provides:

"No power, civil or military, *shall ever interfere to prevent the free exercise of the right of*

power.[57] Today's *Casey* [58] trump of the anti-abortion measure offends both Art. 3, § 5, and Art. 2, § 4.

## SUMMARY

I must remain true to my commitment to the teachings of *Threadgill.* I would not in advance of submission and adoption test for constitutional orthodoxy the content of an initiative petition.[59] The electorate's effort at legislating directly and its unenacted measures should not undergo judicial scrutiny unless the petition is attacked for *noncompliance with the sine qua non procedural requirements for submission.* Nor would I entertain federal constitutional challenges broader than those redressable in federal courts when the case stands in a like forensic procedural framework. As I have done many times before,[60] so once again today I appeal for the court's return to the adjective-law regime that does not allow constitutional scrutiny of unenacted measures. Even if I were now to depart from my *Threadgill* commitment and also throw to the winds the teaching of standing, state and federal, and the prudential rule as well as all other barriers to

deciding purely academic questions, I still could not join today's opinion. This court lacks jurisdiction to test the constitutional fitness of a criminal statute. If it should persist on its path of policing unenacted penal measures for fundamental-law conformity, I would counsel that it invoke the primary jurisdiction doctrine to certify to the Court of Criminal Appeals the criminal-law aspect of the initiative controversy.

The court rests its decision on rather unstable United States constitutional jurisprudence that may change with each confirmation process.[61] Today's pronouncement deprives the proponents of a legitimate use of initiative lawmaking process to advocate a change in the federal constitutional jurisprudence or press for a congressional amendment that would redress their grievance. Lastly, I must counsel against today's use of constitutional orthodoxy to raise an impermissible restraint on the free exercise of political speech.

*suffrage by those entitled to such right."* (Emphasis added.)

**57.** The right of a qualified elector to vote and have that vote counted is basic and fundamental. *McCarthy v. Slater,* Okl., 553 P.2d 489, 490 (1976); *Sparks v. State Election Board,* Okl., 392 P.2d 711, syllabus 1 (1964). *See Jackson v. Maley,* Okl., 806 P.2d 610, 623–624 (1991) (Opala, C.J., dissenting).

**58.** *Supra* note 6.

**59.** "The only options available as a remedy *against invasive initiative power* are (a) to curb—as Justice Mosk suggests—the people's power to create chaos by constitutional amendment defining areas of regulation that lie outside the reserved power of initiative or (b) to act judicially and invalidate an actually *adopted measure when it visits crippling damage to the operations of government by causing institutional paralysis."* *In re Initiative Petition No. 348, supra* note 7 at 787 (Opala, C.J., concurring in result). *See Kennedy Wholesale v. Bd. of Equalization,* 53 Cal.3d 245, 279 Cal.Rptr. 325, 806 P.2d 1360, 1367 (1991) (Mosk, J., concurring), for Justice Mosk's observations about the limits of the electorate's power to legislate by initiative petition.

**60.** *See* cases in *supra* note 7.

**61.** As Justice Blackmun states in his dissenting opinion in *Planned Parenthood v. Casey, supra* note 6, — U.S. at ——, 112 S.Ct. at 2843: "All that remained between the promise of *Roe [supra* note 51] and the darkness of the plurality was a single, flickering flame. Decisions since *Webster* [492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989)] gave little reason to hope that this flame would cast much light.... But now, just when so many expected the darkness to fall, the flame has grown bright. I do not underestimate the significance of today's joint opinion. Yet I remain steadfast in my belief that the right to reproductive choice is entitled to the full protection afforded by this court before Webster. And *I fear for the darkness as four Justices anxiously await the single vote necessary to extinguish the light."* He further observes, "In one sense, the Court's approach is worlds apart from that of the Chief Justice and Justice Scalia. And yet, in another sense, the distance between the two approaches is short— *the distance is but a single vote.* I am 83 years old. I cannot remain on this Court forever, and when I do step down, *the confirmation process for my successor well may focus on the issue before us today.* That, I regret, may be exactly where the choice between the two worlds will be made." *Id., supra,* — U.S. at ——, 112 S.Ct. at 2854. (Emphasis mine.)